## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br><br>**JANICE SCOTT-BLANTON**, *pro se* )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>**UNIVERSAL CITY STUDIOS** )<br>**PRODUCTIONS, LLLP**, *et al.*, )<br> )<br>Defendants. )<br>_____ ) | Civil Case No. **1.07cv00098 (RMU)** |

## OPPOSITION OF DEFENDANTS TO PLAINTIFF'S MOTION
## FOR A PRELIMINARY INJUNCTION

### Introduction

The Motion for a Preliminary Injunction of Plaintiff Janice Scott-Blanton ("Plaintiff") is a misguided, legally untenable, and factually baseless attempt to restrain the further distribution of works that have been in distribution for over a year, based on frivolous copyright infringement claims that Plaintiff knows (or certainly should know) cannot survive on the merits. In this action, Plaintiff has accused Defendants (screenwriters, authors, production companies, a book publisher, a magazine publisher, and a motion picture studio and its affiliates) of copyright infringement, premised on the bizarre theory that the award-winning motion picture *Brokeback Mountain* – which was filmed in mid-2004 (from a script initially completed in 1998 that was based on a short story published in 1997) and edited and finished in early 2005 – "pirated" the characters, plot, and story of Plaintiff's book *My Husband Is On The Down Low and I Know About It* ("*Down Low*"). Plaintiff, however, concedes that *Down Low* first was published in March 2005, well after *Brokeback Mountain* was written and filmed. Nevertheless, now, more than a year after the motion picture was released and almost 10 years after the short story was

published, Plaintiff seeks an overbroad, highly burdensome, and wholly unjustified preliminary injunction that would, in essence, remove the award-wining film (along with the award-winning short story and screenplay on which it is based) from public consumption. Plaintiff's baseless and untimely Motion should be denied.

Plaintiff's infringement claims are frivolous because the undisputed (and indisputable) evidence makes her claims of "copying" factually impossible. Contrary to Plaintiff's unsupported allegations that the "defendants have blatantly and reckless[ly] pirated the plaintiff's novel, including the characters, timeline, and expressions," (PI Memo. at 4), in fact every one of Defendants' works – the *Brokeback Mountain* short story (both as originally published in 1997 in *The New Yorker* and subsequently in book form), the screenplay, and the motion picture itself – was completed long before the Plaintiff published her book. By the time Plaintiff's novel was published (or appeared in a single bookstore), all of the scenes, incidents, characters, and dialog contained in the final motion picture already had been created and placed on film, and thus could not have been copied from *Down Low,* as Plaintiff claims. Furthermore, nearly every one of the purported plot and/or character elements of *Brokeback Mountain* that Plaintiff claims were copied from *Down Low* is contained, virtually word-for-word, in the 1997 short story. Thus, there was no access by any of Defendants, and certainly no copying. And if there could be any remaining doubt, it may be put to rest by a review of the two works, which confirms that they are completely different (both in "concept and feel" and in their characters, plots, and dialog) and that any even arguable similarities are at the level of unprotectible ideas or *scenes a faire*. See Whitehead v. Paramount Pictures Corp., 53 F. Supp. 2d 38, 46-47 (D.D.C. 1999), aff'd, No. 99-7137, 2000 U.S. App. LEXIS 11716 (D.C. Cir. April 19, 2000).

The Court should deny Plaintiff's Motion on this basis alone. But the Court need not even reach this issue, because, even assuming, *arguendo*, that any copying could have taken place, Plaintiff cannot show that the relief she seeks is justified or appropriate. Plaintiff waited 13 months after the release of the motion picture before filing her lawsuit, and 14 months before seeking injunctive relief. This unexplained delay completely undercuts any claim that Plaintiff is

suffering (and will continue to suffer) immediate, "irreparable harm" from the continued distribution of the various *Brokeback Mountain* works. Indeed, whatever hypothetical harm Plaintiff could have suffered from the distribution of those works, she has already suffered. Any purported injury is compensable by money damages. In stark contrast, Defendants will suffer both substantial monetary losses and unfulfilled contractual obligations if an injunction is issued. Finally, the injunction sought by Plaintiff would deny the public continued access to Defendants' highly creative and award-winning works. This would be contrary to the public interest and the First Amendment.

For these reasons, and those set forth below, Plaintiff's Motion should be denied.

## I.    STATEMENT OF FACTS.

**The Short Story**. In October 1997, *The New Yorker* magazine published a short story by Pulitzer Prize-winning author Annie Proulx entitled *Brokeback Mountain* (the "Short Story"). Declaration of Marc E. Mayer ("Mayer Decl."), Ex. A [*The New Yorke*r, October 13, 1997]. The Short Story received the O. Henry Award for short fiction and the National Magazine Award. Mayer Decl., Exs. B & C. The United States District Court for the Southern District of New York described the plot of *Brokeback Mountain* as "an epic love story set in the American West during the summer of 1963 [that] tells the story of two young men – a ranch hand and a rodeo cowboy – who unexpectedly forge a complicated lifelong relationship and a decades-long love affair that they try to hide from the rest of the world." Berlent v. Focus Features, LLC, Case No. 06 Civ. 2834, 2006 WL 1594478, at *1 (S.D.N.Y. June 8, 2006). The Short Story, with the addition of a short prologue and some syntax and punctuation edits, was re-published in 1999 by defendant Simon & Schuster, Inc., in a collection of short stories entitled *Close Range: Wyoming Stories*. See Mayer Decl., Exs. D & E. The story as published in *Close Range* in 1999 was re-published, ***verbatim***, in 2006 (also by Simon & Schuster) as a stand-alone book (entitled

3

*Brokeback Mountain*) and as part of the book entitled *Brokeback Mountain: Story to Screenplay*. Id., Exs. F & G.[1]

**The Screenplay.** Shortly after the original 1997 publication of the Short Story in *The New Yorker*, screenwriters Diana Ossana and Larry McMurtry acquired the screenplay rights. In early 1998, Ossana and McMurtry completed a draft of a screenplay (also entitled *Brokeback Mountain*) (the "Screenplay"). Mayer Decl., Ex. H. On January 26, 1999, McMurtry and Ossana assigned the copyright in and to the Screenplay to Columbia Pictures Industries, Inc., which registered the assignment on March 23, 1999, and separately registered the copyright in the Screenplay (as an unpublished work) on April 6, 2000. See Mayer Decl., Exs. I & J (copyright registration: PAU:2-417-125). Some additional edits to the Screenplay subsequently were made (just prior to the filming of the motion picture *Brokeback Mountain*), and the final shooting script was completed by May 20, 2004. Roth Decl., ¶ 2, Ex. A; Mayer Decl., Ex K.

**The Motion Picture.** Principal photography (i.e., the shooting and filming) for the motion picture *Brokeback Mountain* (the "Motion Picture") commenced on or about May 25, 2004, in and around Calgary, Alberta, Canada. Roth Decl., ¶ 3. Principal photography of the motion picture was completed in August 2004, at which time all of the footage for the motion picture had been created. Id. Thus, by August 2004, virtually everything (including all of the dialog and plot elements) contained in the final theatrical release of the Motion Picture was finished. Id.[2]

---

[1] Plaintiff apparently alleges in her Complaint that at the time the Short Story was published in book form in 2006 it was "reworked" to incorporate elements of her book. Complaint, ¶¶ 12, 34. As noted above, the version of *Brokeback Mountain* published in 2006 (both alone as part of *Story to Screenplay*) was ***identical*** to the version published in 1999 (six years prior to the publication of her book) in *Close Range*. Compare Mayer Decl., Ex. D with Mayer Decl., Ex. F. Likewise, contrary to Plaintiff's claim, the version of *Brokeback Mountain* that was published on the Internet by *The New Yorker* in 2005 is identical to the version that was published in the October 13, 1997, issue. Compare Mayer Decl., Ex. A with Complaint, Ex. F.

[2] Defendant Focus Features, LLC, was the production company responsible for the filming, post-production, and theatrical distribution of the Motion Picture. The Universal defendants (Universal City Studios Productions, LLLP, and Universal Studios Licensing, LLLP) own

(…continued)

On or about September 5, 2004, the Motion Picture entered the "post production" phase. Roth Decl., ¶ 4. During "post-production," the footage is edited; rough cuts of the film are created; music and sound effects are created, composed and/or synchronized with the footage; and visual effects are determined and polished. Id. On January 14, 2005, the Motion Picture was "locked," meaning that editing on all of the visual elements and dialog was completed. Id., ¶ 5, Ex. C. On or about March 9, 2005, the final print (i.e., the "printmaster") was created, which was a final version of the Motion Picture (containing all of the dialog, music, beginning and end credits, and visual and audio effects) used to make the "prints" for delivery and distribution. Id. After that time, the only work done on the film was highly technical, quality control work, which had nothing to do with the dialog, story, or characters. Id., ¶ 6.

The Motion Picture (released in December 2005) was extremely well received by audiences and critics, was nominated for eight Academy Awards (including for "Best Picture"), and received the Academy Award for Best Adapted Screenplay, Best Director and Best Original Score. Mayer Decl., Exs. F & G. It also received the Golden Globe Award for Best Picture, Best Director, and Best Original Song, the New York Film Critic's Circle Award for Best Picture, and the Golden Lion Award for Best Picture at the 2005 Venice International Film Festival. Id. The Motion Picture was released on DVD on April 4, 2006. Declaration of Richard Longwell ("Longwell Decl."), ¶ 3. It currently is being shown on pay cable networks. Id.

***Down Low.*** According to her Complaint, in November 2004 Plaintiff "originated and created" the novel *My Husband Is On The Down Low And I Know About It: A True Story* ("*Down Low*"). See Complaint, ¶ 21. *Down Low* was self-published by Plaintiff on March 15, 2005 – nearly eight years after the Short Story and Screenplay were written, six months after principal photography of the Motion Picture had been completed, two months after all the visual

_____

(…continued)
certain rights to exploit the Motion Picture through various channels, including via DVD, pay-per-view and cable broadcasting.

elements of the Motion Picture were "locked," and six days after the final printmaster of the Motion Picture was completed.  Complaint, ¶ 27.

*Down Low*, in the author's words, is "[b]ased on a true story" about "the life of a wife who is confronted with her military husband's lifestyle of living on the 'Down Low.'"  Mayer Decl., Ex. L [*Down Low*].   Although Plaintiff claims that *Down Low* has been in distribution since March 2005, she has not submitted any evidence establishing that even a single copy of *Down Low* ever has been sold (much less that anyone employed by or affiliated with Defendants had bought it or ever had seen it prior to the plaintiff raising her claim).[3]

**Plaintiff's Infringement Claims And Her Request For Injunctive Relief.**  Plaintiff claims that on June 11, 2006 (approximately six months after the theatrical release of the Motion Picture), she watched the motion picture for the first time and that it was "evident" and "clear" to her at that time that her novel "had been stolen and adapted into the motion picture film *Brokeback Mountain*."  Complaint, Ex. P, "Background" ¶ 3.  Nevertheless, Plaintiff took no action in furtherance of her claim until November 27, 2006, when she sent a "cease and desist" letter to certain of Defendants.  Complaint, Ex. M.  On December 18, 2006, a representative of Universal Studios responded to Plaintiff's letter, categorically rejected her claim, and advised her that principal photography on *Brokeback Mountain* had been completed in 2004.  Complaint, Ex. N.

On January 16, 2007 – more than one month after receiving Universal's letter – Plaintiff filed this lawsuit against 14 Defendants, including various Universal-affiliated motion picture studios and licensing entities, production companies, *The New Yorker*, Simon & Schuster, Ossana, McMurtry, director Ang Lee, and others.  On February 13, 2007 (a month after filing her lawsuit), Plaintiff, without any prior notice to Defendants, (see LCvR 7(m)), filed her Motion for

---

[3]   In addition to the timing issues discussed above, this failure also precludes Plaintiff from prevailing on the issue of "access."  See Jason v. Fonda, 698 F.2d 966 (9th Cir. 1982) ("bare possibility" of access is insufficient).

1226588.4

a Preliminary Injunction, apparently[4] seeking an order "enjoining all of the defendants, immediately, from distributing, showing, marketing, or otherwise generating any revenues or profiting or selling in anyway whatsoever in connection with the motion picture *Brokeback Mountain* and its related screenplay and short story, or any derivative works of same in any medium or outlet, either domestically or internationally."  Motion at 1.

## II.    THE LEGAL STANDARD.

"In considering whether to grant preliminary injunctive relief, the court must consider whether: (1) the party seeking the injunction has a substantial likelihood of success on the merits; (2) the party seeking the injunction will be irreparably injured if relief is withheld; (3) an injunction will not substantially harm other parties; and (4) an injunction would further the public interest."  CSX Transp., Inc. v. Williams, 406 F.3d 667, 670 (D.C. Cir. 2005). Preliminary injunctive relief is an "extraordinary and drastic" remedy.  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).  As such, it should be issued "sparingly" and only after the party seeking relief, "by a clear showing, carries the burden of persuasion."  Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004); see also Fund For Animals v. Norton, 374 F. Supp. 2d 91, 98 (D.D.C. 2005).

## III.   PLAINTIFF'S INFRINGEMENT CLAIMS ARE FRIVOLOUS.

In order to prevail on her claims for copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). Where, as here, the plaintiff is without any direct evidence of "copying," the plaintiff must

---

[4]  Plaintiff did not include a proposed order with her Motion, notwithstanding the requirements of LCvR 7(c).

1226588.4

demonstrate that the defendants "had access to the copyrighted work and that the works are 'substantially similar.'" Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1248 (11th Cir. 1999).

The Court need not even consider the issue of "substantial similarity" because the undisputed facts preclude even the ***possibility*** of copying, including because there could not have been access by Defendants to Plaintiff's work.[5]  This is because all of the allegedly infringing works were written, created, and filmed ***prior to*** the publication of *Down Low*.  Plaintiff herself readily admits, as she must, that the Short Story originally was published in 1997 (and in slightly revised form in 1999).  See Complaint, ¶ 34 .  The Screenplay likewise was created in 1998, registered with the United States Copyright Office in 2000, and in its final edited form by May 2004.  Roth Decl., ¶ 2; Mayer Decl., Exs. J & K.  Finally, as set forth in the Declaration of Jeffrey Roth, principal photography on the Motion Picture had been completed by August 2004, the Motion Picture was in post-production throughout the remainder of 2004 and early 2005, and the final print was completed in March 2005.  Roth Decl., ¶¶ 3-5.  In other words, all of the characters, scenes, incidents, and events in the Short Story, the Screenplay, and the Motion Picture that purportedly give rise to Plaintiff's infringement claims were created and completed months or years prior to the publication of *Down Low*.  Accordingly, there is no basis in law or in fact for any of Plaintiff's claims for copyright infringement – far less her claim that Defendants "intentionally and knowingly pirated the plaintiff's novel[,]" (PI Memo. at 4).  See

---

[5]  Although the Court need not reach the issue, even a cursory review of *Brokeback Mountain* and *Down Low* confirms that the works are entirely different, both in "total concept and feel" and in their individual components.  See Johnson v. Gordon, 409 F.3d 12, 18 (1st Cir. 2005) ("The key is whether the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the works' aesthetic appeal as the same."); see also Costello v. Loew's Inc., 159 F. Supp. 782, 788 (D.D.C. 1958) ("[O]nly a strained interpretation and hypercritical dissection of small segments of [the plaintiff's] drama or defendant's picture, or both" could lead to a finding of similarity.)  As for Plaintiff's claim that the works both involve "emotional turmoil," trauma, marriage, children, confrontation, divorce, homosexual sex, and addictive behaviors, these are abstract similarities that are uncopyrightable "ideas" or are unprotectible *scenes a faire*.  Herzog, 193 F.3d at 1248.  Indeed, in light of the timeline set forth above, to the extent that there are any similarities between *Brokeback Mountain* and *Down Low*, it is more plausible that they resulted from the ***Plaintiff*** copying *Brokeback Mountain*.

1226588.4

Pellegrino v. Am. Greetings Corp., 592 F. Supp. 459, 461-62 (W.D.S.D. 1984) (summary judgment for defendant where the defendant's allegedly infringing cartoon character "was in a copyrighted work before the Plaintiff ever showed his work to anyone"), aff'd, 760 F.2d 272 (8th Cir. 1985); Hebert v. Wicklund, 744 F. 2d 218, 219 (1st Cir. 1984) (affirming summary judgment where plaintiff had produced no evidence to counter the defendant's evidence that she had written and marketed the allegedly infringing work long before receiving plaintiff's copyrighted material).[6]

## IV.    PLAINTIFF'S UNEXPLAINED 14-MONTH DELAY ALSO WARRANTS DENIAL OF HER MOTION.

Plaintiffs' motion also should be denied because she cannot (and has not even attempted to) justify her excessive and unreasonable delay in seeking injunctive relief.  It is well-established that "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." Newdow v. Bush, 355 F. Supp. 2d 265, 292 (D.D.C. 2005); see also Delmatoff, Gerow, Morris Langhans, Inc. v. Children's Hosp. Nat'l Med. Ctr., Civ.A. No. 89-0219, 1989 WL 168856, at *3 (D.D.C. May 3, 1989) (plaintiff's year-long delay in filing for preliminary injunction undermined claim that irreparable harm would result if such relief was denied); Richard Feiner & Co. v. Turner Entm't Co., 98 F.3d 33, 35 (2d Cir. 1996) (no injunctive relief available in copyright infringement claim

---

[6]  The absence of copying additionally is confirmed by the fact that virtually every one of the purported "substantial similarities" in the plots and characters of the two works that Plaintiff claims were copied from *Down Low* were present (virtually word-for-word) in the **1997** Short Story (published more than **eight years** prior to *Down Low*).  See Complaint, ¶ 40; see also Mayer Decl., Ex. M [Chart of similarities].  Plaintiff cites two or three purported similarities that are not derived directly from the Short Story, but rather from the screenplay that was completed in 2004.  In fact, some of the features that Plaintiff calls "similarities" are diametrical opposites. See, e.g., PI Memo. at 10-11 (in *Down Low*, "Annette gives birth to a baby ***girl***" and "James ***couldn't be there***"; in *Brokeback Mountain*, "Lureen gives birth to a baby ***boy***" and "Jack ***was there***") (emphasis added).

where plaintiff delayed in seeking relief, because "such a delay...is suggestive of a lack of irreparable harm."). As the Second Circuit explained:

> Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action. . . Citibank did not seek the injunction until September 14 – more than ten weeks after it learned directly of Citytrust's plans, and more than nine months after it received notice through the press that Citytrust intended to open a Long Island branch. . . In short, Citibank's failure to act sooner "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."

Citibank, N.A. v. Citytrust, 756 F.2d 273, 276-77 (2d Cir. 1985) (internal citations omitted).

Plaintiff readily admits, as she must, that the Motion Picture was released to the public in December 2005 – more than a year prior to her lawsuit. The content and story of the Motion Picture were well-publicized, and Plaintiff thus certainly was on notice (either actual or constructive) of any potential infringement claims at that time. See Berlent, 2006 WL 1594478, at *1 ("The movie [Brokeback Mountain]…generated considerable attention and anticipation before and after the nationwide release of the movie trailer in August 2005."); Mount v. Book-Of-The-Month Club, Inc., 555 F.2d 1108, 1110 (2d Cir. 1977) (plaintiff could have and should have discovered the infringement where the necessary information was available at the time of the infringement); Kepner-Tregoe, Inc. v. Executive Dev., Inc., 79 F. Supp. 2d 474, 489 (D.N.J. 1999) ("[T]he law conjoins a duty to bring suit promptly with [a] duty to monitor… delay begins when the plaintiff knew, or in the exercise of reasonable diligence should have known, of the defendant's allegedly infringing activity."). In any event, Plaintiff specifically alleges that she viewed the Motion Picture in June 2006, and thus had actual knowledge of her claims at that time. See Complaint, ¶ 28. Nevertheless, she waited *more than five months* after viewing the film (i.e., until November 27, 2006) before sending a letter to any of the Defendants – and then two more months after receiving Defendants' December 18 response before filing this motion on February 12, 2007. See Complaint, Exs. L & N. In other words, by the time Plaintiff filed this

motion, the Motion Picture had been available to the public for more than 14 months, and she admittedly knew of her claims for more than seven months.

Plaintiff does not offer *any* justification or rationale for this delay. (Indeed, she does not even mention or address this delay in her injunction papers). Of course, if Plaintiff truly believed, as she now claims, that the "harm being inflicted on [her] is permanent, ongoing, and irreparable[,]" (PI Memo. at 16), she could have – indeed, should have – filed her lawsuit many months ago.

## V.    PLAINTIFF WILL SUFFER NO "IRREPARABLE INJURY" IF AN INJUNCTION IS NOT ISSUED, WHILE THE REQUESTED INJUNCTION WOULD RENDER A SEVERE HARDSHIP TO DEFENDANTS.

Plaintiff's claim of irreparable injury fails because, as she readily admits, the Short Story was published many years ago and the Motion Picture *Brokeback Mountain* was released to the public more than a year ago and has been in wide distribution (including on DVD, pay-per-view television, and pay cable television) for many months. As a result, even if it were the case that the release of the film could have caused "irreparable harm" to the Plaintiff, that harm already has occurred in all material respects. Indeed, Plaintiff specifically argues that the harm she purportedly has suffered "***thus far is permanently irreparable*** because the plaintiff simply cannot now gain notoriety and prestige for her work since the defendants have so maliciously and reckless [sic] saturated the public with… deceit…" PI Memo. at 16 (emphasis added). Thus, Plaintiff in effect concedes that "[i]ssuing a preliminary injunction now would not remedy that confusion or lessen that damage." Berlent, 2006 WL 1594478, at *2; see Clonus Associates v. Dreamworks LLC, 417 F. Supp. 2d 248, 254-57 (S.D.N.Y. 2005) (finding no irreparable harm in part because whatever harm the distribution of an allegedly infringing movie would cause, it had already caused); Marcy Playground, Inc. v. Capitol Records, Inc., 6 F. Supp. 2d 277, 282 (S.D.N.Y. 1998) ("[A] preliminary injunction here would be very much like locking the barn door after the horse is gone.").

11

In Berlent, the composer of a musical composition entitled "Slow Dance" sought to enjoin further distribution of the motion picture *Brokeback Mountain* based on his claim that the theme song from the motion picture infringed his work. However, the plaintiff claimed (much as Plaintiff does here) that he was unaware of the film ("despite the media advertising and talk show frenzy that accompanied the release of *Brokeback Mountain*," Berlent, 2006 WL 1594478, at *2) until mid-March 2006 (more than four months after the film's theatrical release), and did not bring his lawsuit until April 11, 2006. As a result of that timing (and without even considering the potential merits of the claim), the Court denied Plaintiff's request for an injunction:

> Plaintiff brought this case eight months after the movie trailer was released, five months after the soundtrack was released, four months after the movie opened, and more than one month after Santaolalla [the composer of the allegedly infringing son] won the Oscar for Best Original Score. As a result, the harm Plaintiff seeks to prevent has already occurred… Plaintiff argues that he "has been placed in the intolerable position of not receiving credit for a work he conceived and for which someone else received an Oscar." While there is no question that if Defendants infringed Plaintiff's copyright, Defendants will have created confusion in the marketplace that damaged Plaintiff, issuing a preliminary injunction now would not remedy that confusion or lessen that damage.

> In fact, the issuance of a preliminary injunction today would not lessen any confusion in the marketplace. Given that the movie, the DVD, and the CD soundtrack have already been released and [the song writer] has already received public recognition as the composer of the music, the only way for Plaintiff to lessen or ameliorate the confusion in the marketplace is for his rights to be vindicated at trial.

Berlent, 2006 WL 1594478, at *2 (internal citations omitted). This logic applies even more forcefully here. Like the plaintiff in Berlent, Plaintiff's claimed irreparable harm is the very same "marketplace confusion" that the Berlent court held would not be ameliorated or remedied by an injunction. But whereas in Berlent, the Motion Picture had only been released four months prior to the Plaintiff's application for a preliminary injunction, the Motion Picture now has been

12

available to the public for well over a year.  Further, in <u>Berlent</u>, the DVD had not yet been released; now, the DVD has been available to the public for nearly a year.  And whereas the plaintiff in <u>Berlent</u> sought an injunction within a month after the date he claimed to have learned of the infringement; Plaintiff waited seven months to do so.

Additionally, an injunction is not justified here because Plaintiff has failed to present ***any*** tangible evidence that she will suffer any "irreparable injury" if her motion is denied.  <u>Sea Containers Ltd. v. Stena AB</u>, 890 F.2d 1205, 1210-11 (D.C. Cir. 1989) (A moving party has the "burden of showing sufficient irreparable harm to command a preliminary injunction from the district court.").  "This court has set a high standard for irreparable injury.  First, the injury must be both certain and great; it must be ***actual and not theoretical***.  The moving party must show [t]he injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm.  Second, the injury must be beyond remediation."  <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotations and citations omitted, emphasis added).  In support of her request for an injunction, Plaintiff offers, at best, only conclusory, purely speculative statements that are unsupported by ***any*** evidence.  <u>See</u>, <u>e.g.</u>, <u>CityFed Fin. Corp. v. Office of Thrift</u>, 58 F.3d 738, 747 (D.C. Cir. 1995) (affirming denial of preliminary injunction where plaintiff failed to show "some injury").

In contrast to Plaintiff's speculative assertions of harm, the injury that Defendants would suffer if an injunction issues is both demonstratively certain and significant.  A preliminary injunction would stop the further distribution or sale of the *Brokeback Mountain* works (including the Short Story, the Screenplay, and the Motion Picture) in any form and all media, presumably throughout the world.  Compliance with such a broad and sweeping injunction would create massive logistical problems and would inflict severe financial and reputational injuries on Defendants.  Defendants already have incurred substantial expense in manufacturing, distributing, and promoting the theatrical and DVD release of the Motion Picture and in licensing the Motion Picture for distribution via television.  Television exploitations have been scheduled and advertised.  From a purely logistical standpoint, it would be almost impossible for

1226588.4

Defendants to recall from retailers all copies of the DVD, stop further theatrical displays of the Motion Picture, or pull the Motion Picture from on-demand and cable television lineups. Longwell Decl., ¶¶ 2-5. Even if it were possible to do so, for Defendants to recall DVDs from their retail customers would result in severe reputational damage to Defendants.[7] Id., ¶ 4. These are precisely the types of harms that justify the denial of a preliminary injunction. See John Lemmon Films, Inc. v. Atlantic Releasing Corp., 617 F. Supp. 992, 997 (W.D.N.C. 1985) (where grant of preliminary injunction would cause defendant to lose contracts, and require defendant to change its film prints and to develop a new advertising campaign, Court held it would be inequitable to cause defendant to lose its investment and goodwill before final decision on the merits); Tsiolis v. Interscope Records, Inc., 946 F. Supp. 1344, 1357 (N.D. Ill. 1996) ("[T]he harm to the Defendants in delaying the sale of the Album until after trial far outweighs the potential harm to Tsiolis…Defendants have already spent over one million dollars recording, producing and marketing the Album."); Arco Fuel Oil Co. v. Atlantic Richfield Co., 427 F.2d 517, 519 (2d Cir. 1970) (despite claim by plaintiff that defendant's use of mark would destroy plaintiff's identity, no injunction granted where injunction would affect national advertising campaign of defendant).[8]

---

[7] In addition to the foregoing, in this day of massive production costs, motion picture studios do not undertake the financial burden of film production based on anticipated box office revenues alone, nor do studios necessarily recoup their costs from actual box office revenues. Longwell Decl., ¶ 2. Rather, studios often depend on subsequent DVD, pay-per-view, pay cable and other ancillary revenues to have any realistic chance of realizing a profit on their enormous investments. Id. While Brokeback Mountain enjoyed immense artistic success in its theatrical release, the return on the investment in this Film will largely be dependent on precisely those avenues of distribution and exploitation which Plaintiff is seeking to enjoin. Id.

[8] There is no basis for an injunction, under *any* circumstances, against the distribution of the **Short Story** (or any of the books in which it is contained) because even Plaintiff concedes that the Short Story was written and originally published long before *Down Low.* In any event, the books *Close Range*, *Brokeback Mountain*, and *Story to Screenplay* have been in wide distribution by retailers for months or years, and thus the logistical and financial harms that

(…continued)

## VI.     AN INJUNCTION IS CONTRARY TO THE PUBLIC INTEREST.

Plaintiff does not cite any authority for her claim that the injunction she seeks is in the "public interest." Nor does she even attempt to explain how that far-reaching and highly-burdensome injunction – which, if issued, would remove from the marketplace *all* materials relating to *Brokeback Mountain*, including the critically acclaimed and award-winning Short Story, Screenplay, and Motion Picture – could possibly be in the public interest. To the contrary, an injunction would be "at odds with the shared principles of the First Amendment and the copyright law" and would "act[] as a prior restraint on speech." Suntrust Bank v. Houghton Mifflin Co., 268 F.3d 1257, 1277 (11th Cir. 2001). Accordingly, any purported injury suffered by Plaintiff may be, and should be, addressed (if at all) only by monetary relief. Id. at 1277 (Where the alleged infringement involves two original works – and not "simple piracy" – there is "a strong public interest in the publication of the secondary work and the copyright owner's interest may be adequately protected by an award of damages for whatever infringement is found.")[9]

---

(…continued)
would result from any injunction of the Motion Picture equally would be applicable to these works.

[9] Plaintiff's claim that an injunction is in the "public interest" is premised on her claim that it would assist in informing the public "that the motion picture was based on the plaintiff's novel." PI Memo. at 17. Of course, an injunction prohibiting the manufacture, distribution, or other exploitation of the Motion Picture would do nothing to accomplish this end.

1226588.4

## <u>Conclusion</u>

For the foregoing reasons, Defendants respectfully request that Plaintiff's Motion for a

Preliminary Injunction be denied.[10]


Date:  March 7, 2007                              Submitted by:


                                                  /s/ Steven J. Metalitz
                                                  Steven J. Metalitz (D.C. Bar No. 944603)
                                                  MITCHELL SILBERBERG & KNUPP, LLP
                                                  2300 M Street, N.W., Suite 800
                                                  Washington, D.C. 20037
                                                  (202) 973-8109 (Telephone)
                                                  (202) 973-8110 (Facsimile)

                                                  Marc E. Mayer (*pro hac vice*)
                                                  MITCHELL SILBERBERG & KNUPP LLP
                                                  11377 West Olympic Boulevard
                                                  Los Angeles, California 90064-1683
                                                  (310) 312-2000 (Telephone)
                                                  (310) 312-3100 (Facsimile)
                                                  *Attorneys for Defendants*

---

[10]  In the event that this Court is inclined to issue any form of injunction against Defendants, Defendants request the opportunity to separately and fully brief both the form of the injunction and the amount of any bond required by the plaintiff.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing OPPOSITION OF DEFENDANTS TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION has been served, via Federal Express and via the Court's electronic filing system, to the following address on March 7, 2007:

Janice Scott-Blanton
3578 Wharf Lane
Triangle, VA 22172

/s/ Marc E. Mayer
Marc E. Mayer
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
(310) 312-2000 (Telephone)
(310) 312-3100 (Facsimile)
*Attorneys for Defendants*

17

1226588.4