**In The**
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Washington, D.C.**

JANICE SCOTT-BLANTON, *pro se,*

Plaintiff,

vs.                                        CIVIL ACTION NO. <u>1:07cv0098</u> $\mathcal{R}H\,\mathcal{U}$

UNIVERSAL CITY STUDIOS PRODUCTIONS, LLLP, et al.,

Defendants.

<u>PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN RESPONSE
TO DEFENDANTS' SUPPLEMENTAL BRIEF IN RESPONSE
TO THE COURT'S ORDER DATED AUGUST 26, 2007
REGARDING MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Janice Scott-Blanton, proceeding *pro se,* submits this supplemental

memorandum pursuant to the Court's Minute Order issued on August 26, 2007. In that

Order, the Court requested the parties to submit supplemental briefing addressing the

appropriateness of ruling on the defendants' summary judgment motion before discovery

has commenced. For the reasons that follow and those stated by the plaintiff in her

opposition to the defendants' motion for summary judgment and Rule 56(f) request to

proceed to discovery in this case, plaintiff submits that this case is ripe for proceeding to

discovery.

In the Order, the Court cited *Americable Intern., Inc. v. Department of Navy,* 129

F.3d 1271 (D.C. Cir 1997) in which was ruled, "summary judgment 'ordinarily is proper

only after the plaintiff has been given adequate time for discovery.'" 129 F.3d at 1274

(citing *First Chicago Int'l v. United Exch. Co.,* 836 F.2d 1375, 1380 (D. C. Cir. 1988)).

**RECEIVED**

SEP 2 6 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

The basis for the Circuit Court's ruling was that the record was devoid of any evidence as to who would perform the functions of operating and maintaining a new SMATV system the Navy had installed at one of its facilities even though the plaintiff had, like the plaintiff in this case, "cited the need for discovery, *inter alia,* to find out what the nature of the services is going to be." *Id.,* at 1274. The court found this issue to be dispositive and that the district court was in error to grant summary judgment in the absence of evidence addressing the issue.    The defendants have argued that *Americable* is inapplicable to the facts of the case at bar.    Plaintiff disagrees because principles underlying the *Americable* ruling are right on point in this case.

This is an ordinary case in which plaintiff should be afforded "adequate time for discovery." *Celotex Corp. v. Catrett,* 477 U. S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)[1]; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (plaintiff must have "a full opportunity to conduct discovery").    Some courts reserve pre-discovery summary judgment for exceptional circumstances. *Patton v . General Signal Corp.,* 984 F.Supp. 666, 669 (W.D.N.Y. 1997) ("prediscovery summary judgment remains the exception rather than the rule"); *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 10 (2nd Cir. 1983) (The court "frequently emphasized the critical importance of discovery in summary judgment context" and that "summary judgment should not be granted while the party opposing judgment timely seeks discovery of potentially favorable information"); *Hellstrom v. U. S. Dept. of Veterans Affairs,* 201 F.3d 94, 97 (2nd Cir. 2000) ("Only in the rarest of cases may summary

---

[1]    Adequate time for discovery is consistent with Rule 56(c) making summary judgment proper where "the pleadings, *depositions, answers to interrogatories, and admissions on file,* together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ. P. 56(c) (emphasis added).    This rule actually contemplates the plaintiff being able to come forth with "depositions, answers to interrogatories, and admissions on file" in opposing a summary judgment motion and such evidence could only be obtained through discovery.

2

judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery").

Furthermore, some courts have emphasized that a party's Rule 56(f) "motion should be liberally treated." *Committee for the First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992); *Black v. National Football League Players Ass'n.*, 87 F.Supp.2d 1 (D.D.C. 2000) (Rule 56(f) "requests should be liberally construed"); *Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*, 18 F.3d 260, 264 (4th Cir.) (Plaintiffs had not yet established their tort claims, but "they [we]re alleged in the complaint and the plaintiff should have [been given] the opportunity to develop support for its claims through discovery"); *WSB-TV v. Lee*, 842 F.2d 1266, 1269 (11th Cir. 1988) (where plaintiffs in six-month-old civil rights case had been afforded no opportunity for discovery, district court's consideration of defendant's motion for summary judgment was erroneous). Like the plaintiff in both *Hellstrom* and *WSB-TV*, the plaintiff in this case has been denied any opportunity to conduct discovery chiefly because of the early state of this litigation. For this reason, plaintiff is prohibited by the federal rules of civil procedure from engaging the defendants in discovery, even though the defendants have clearly engaged in informal discovery amongst themselves in order to support and file their motion for summary judgment.

The defendants' have argued that the problem with the "Plaintiff's case is one of chronology." *Def. Supp. Br.*, p 2. The defendants have submitted a rather persuasive (about something, but not this case) brief and argument that misses the mark and focuses blindly and arrogantly on ***their*** purported "copious evidence." The defendants' basic premise is that all of their works, i.e., the short story, screenplay and motion picture for

*Brokeback Mountain,* were created long before the plaintiff published and or conceived her novel, *My Husband Is On The Down Low And I Know All About It.*

### The Short Story.

The defendants have asserted that the short story in the record was published in 1997. Plaintiff acknowledges that a basic, skeletal version of a short story under some title or another was written in 1997 by defendant Proulx, but not the version of the *Brokeback Mountain* short story in the record. In her memorandum opposing the defendants' motion for summary judgment, plaintiff argued this precise point and in support thereof directed the Court's attention to publicly available interviews of key persons involved in the *Brokeback Mountain* saga. One such interview was for defendant Proulx who specifically acknowledged and stated that her original short story had been changed. Plaintiff did not stop there, but also directed the Court's attention to publicly available interviews of screenplay writers, defendants' Ossana and McMurtry, in which each of them acknowledged specific scenes *they created* as well as the domestic life for the two main male characters *they created* during their writing of the screenplay.[2] And yet, Ossana's and McMurtry's newly created scenes and domestic life additions can be found in the version of the short story in the record.[3] Indeed, plaintiff also pointed out interviews in which defendants Proulx, Ossana and McMurtry acknowledged that Proulx's original short story was skeletally written and said little about the wives of the main characters. And yet the supposed skeletally written short story is replete with many

---

[2]    Defendant Ossana acknowledged in 2005 that she and McMurtry used their own "imaginations to expand and build upon [defendant Proulx's short story] rounding out characters, creating new scenes, fleshing out existing ones." *See* defendant Ossana's essay entitled "Climbing Brokeback Mountain", page 146, included in *Brokeback Mountain: Story to Screenplay.*

[3]    The defendants have argued that this Court "has apparently already rejected this version of reality since it found that 'the short story, published in 2005, is virtually identical to works published before plaintiff's novel.'" *Def. Br.,* p. 7, n. 5 (citing Mem. Op. & Order, July 19, 2007 (Docket No. 36) at 6).

scenes and dialogue involving the wives of the main male characters and an expansive domestic life.[4]

Plaintiff strongly urges this Court to reject the defendants attempt to lure it into applying a high standard for allowing discovery to proceed. To follow the defendants' logic, this Court would have to completely disregard the publicly available interviews and statements of key individual defendants submitted by the plaintiff.[5] Contrary to the defendants' erroneous and specious assertions, plaintiff is not making conclusory statements that the original short story is not before this Court. It is clearly not speculative that, according to certain of the defendants own public statements, the version of the short story in the record "should not and could not" contain the added scenes and domestic life dialogue, but rather is sufficient to raise questions about the veracity and truthfulness of the defendants' declaration assertion that the short story in the record is the original short story. Plaintiff submits that by directing the Court's attention to discrepancies with the defendants' assertions regarding the short story in the record, she has met the threshold for invoking this Court's discretion under Rule 56(f) to allow discovery to proceed on this issue.[6]

---

[4]     Contrary to the defendants' assertion that there is a deposited copy of the original short story and *New Yorker Magazine* on deposit with the copyright office, plaintiff attempted on several occasions to obtain the deposited copy, but the copyright office did not have the magazine at all. A copy of the receipt indicating that the deposited copy was missing is attached hereto as Exhibit A. Plaintiff recently checked with the copyright office just prior to this filing and a copy of *The New Yorker* magazine is now on record with the Library of Congress and is the same version in the record.

[5]     One might argue whether the publicly available transcripts of interviews of defendants Proulx, Ossana and McMurtry submitted by plaintiff would be admissible as evidence at trial or on summary judgment in the form submitted by the plaintiff. However, one cannot credibly argue that the interviews would be insufficient to invoke the Court's discretion under Rule 56(f) to allow plaintiff to pursue discovery related to them in order to determine why and when the newly created scenes and domestic life dialogue were included in the version of the short story in the Court's record.

[6]     Ironically, the one person, defendant Proulx, most familiar with and who actually authored the original version of the short story is being kept silent on this issue in the face of all of the discrepancies with her short story presented in this litigation. It would be **highly prejudicial** to the plaintiff to rule on the defendants' motion for summary judgment without giving plaintiff an opportunity to question defendant Proulx about her writing. This is especially true since the defendants have amongst themselves already

**The Screenplay.**

The defendants have relied on the assertion that the screenplay was "created in 1997, copyrighted in 2000, and revised in 2003." *Def. Br.,* p. 2. That represents two copies of the screenplay.[7] However, plaintiff directed the Court's attention to statements by defendants Ossana and McMurtry stating that the final screenplay was 180-pages, far more than the "60 pages" originally written by them in 1997, far more than the 97 pages in the book *Brokeback Mountain: Story to Screenplay,* and far more than the 113-page screenplay copyrighted in 2004.[8] Moreover, plaintiff specifically pointed out in her initial opposition that the book *Brokeback Mountain: Story to Screenplay* stated that a version of the screenplay was copyrighted in 2005. The defendants caused that representation to be made in the book and elsewhere and cannot now run away from it or discount it as irrelevant. Furthermore, plaintiff pointed out that defendants Ossana and McMurtry published a version of the screenplay in October 2005, months after publication of plaintiff's novel.

Yet again, *Americable* is right on point here. This Court is without sufficient evidence to make a determination as to which screenplay, if any, was actually used by the defendants in making the motion picture. Of course, the defendants are asking this Court to completely disregard the fact that the record is devoid of the screenplays that are either

---

engaged in informal discovery and have used fruits of that informal discovery to support their motion. *See* Mayer declaration, ¶ 2.

[7]      In an interview by Matthew Testa of the website Planet Jackson Hole Online, www.planettjh.com, on December 7, 2005, defendant Proulx, in responding to Mr. Testa's question, stated that she "did read several versions of the screenplay." A copy of that interview is attached hereto as Exhibit D, but as of this writing, was no longer available on the website.

[8]   The defendants, being in the **exclusive possession** of all of the relevant documents in this case, have cleverly submitted only the cover page from *a* screenplay as an Exhibit A to the Roth declaration. Indeed, even the screenplay in the book *Brokeback Mountain: Story to Screenplay* is not the 113-page screenplay relied on by the defendants in this litigation. Like the *Americable* court, this Court is without evidence to determine whether there is a disputed issue of fact related to the screenplay. *See Madrid v. Chronicle Books,* 209 F.Supp.2d 1227, 1232 (D. Wyo. 2002) ("The movant's exclusive control of such information is a factor weighing heavily in favor of relief under Rule 56(f)").

60-pages, 113-pages (on which the defendants now rely), 180-pages or some other number. The defendants have hung their hat squarely on the 113-page screenplay that was copyrighted in 2004 to the complete disregard of the screenplay they stated in the book, the motion picture and on compact disc packaging was copyrighted in 2005[9] as well as defendants Ossana's and McMurtry's statements that the final screenplay was about 180-pages.

Plaintiff submits that by directing the Court's attention to discrepancies with the defendants' assertions regarding the screenplay she has met the threshold for invoking this Court's discretion under Rule 56(f) to allow discovery to proceed on this issue.

**The Motion Picture.**

The defendants continue to assert that "[t]he motion picture was filmed in 2004 and was in final form by early 2005." *Def. Br.,* p. 2. Specifically, the defendants asserted by the Roth declaration that filming for the motion picture was completed by August 5, 2004 and that no additional filming took place.

In their recent filing, the defendants, relying on 17 U.S.C. § 410(c), have argued that the date of creation stated in copyright registration certificates is *prima facie* evidence of when that particular work was created. Accepting without opposition that premise, then the copyright certificate in the record for the motion picture clearly stated that the motion picture was created in 2005, not 2004 as alleged by the Roth declaration. The defendants cannot now disown the creation date stated in the copyright certificate they say represents *prima facie* evidence of the date of creation. Consequently, the defendants own actions, by way of the Roth declaration and the copyright registration

---

[9]     It is entirely reasonable for anyone who reads the statement contained in the defendants' books and or packaging for the motion picture or in images in the motion picture that the screenplay was copyrighted in 2005 to assume it to be accurate.

certificate for the motion picture, created a genuine factual dispute as to which year the motion picture was created. It does not end there.

Lead actors from the motion picture, Heath Ledger (who played Ennis in the motion picture) and Michelle Williams (who played Alma, Ennis's wife, in the motion picture), have been widely reported in the media to have fallen in love while on set filming the motion picture. As a result of that love affair and during the period of time the actors were filming the motion picture, Ms. Williams acknowledged in a publicly available interview that she conceived a child with Mr. Ledger. Notably, Ms. Williams stated that the child was conceived during the time she and Mr. Ledger were working together on the motion picture, and that the child was born on October 28, 2005. *See* the website SFGate.com at http://sfgate.com/cgi-bin/blogs/sfgate/detail?blogid=7&entry_id=960.[10]   A copy of the article for Ms. Williams's interview is attached hereto as Exhibit B. It is widely accepted that nine (9) months is the full term for carrying a child and that would place conception of the child in or around late-February/early-March 2005. In yet another article the Boston Herald website, http://www.bostonherald.com/track/star_tracks/view.bg?articleid=1029216, in reporting on Ms. Williams and Mr. Ledger's relationship, specifically reported that the couple fell in love while filming the motion picture in **"2005."** A copy of the Boston Herald website's article is attached hereto as Exhibit C.

Collectively, the copyright registration certificate stating the motion picture was created in 2005, images in the motion picture and on the DVD packaging that state the motion picture was copyrighted in 2005, the interview remarks by Ms. Williams admitting that she conceived her child during filming of the motion picture (perhaps in or around late-February/early-March 2005), and the Boston Herald website article reporting

---

[10]        See also http://people.monstersandcritics.com/news/article_1050393.php (same).

that filming of the motion picture occurred in 2005 all point to the creation and filming of the motion picture in 2005. The creation date stated in the copyright registration certificate alone is, according to the defendants, *prima facie* evidence that rebuts their assertion in the Roth declaration that the motion picture was created in 2004 and that no filming occurred after August 2004. The actress's comments about her child, the copyright date stated in the motion picture and on its DVD packaging and the Boston Herald website's article all tend to suggest that the defendants were indeed filming and working on the motion picture in and around March 2005.

Plaintiff submits that by directing the Court's attention to discrepancies with the defendants' assertions regarding creation of the motion picture, she has met the threshold for invoking this Court's discretion under Rule 56(f) to allow discovery to proceed on this issue.

### Access To Plaintiff's Novel.

Once again the defendants have hung their hat on not having access to the plaintiff's novel prior to creating their own work. Plaintiff's novel was published in March 2005 and she has established that the motion picture was created in 2005. All of the defendants' *Brokeback Mountain* related publications in the record were either published or republished after March 2005. The defendants also contend that their works and the plaintiff's novel have no substantial similarities and are entirely different in both concept and feel. *Def. Br.*, p. 7, n. 6. These contentions are belied by the defendants own handy work comparing passages and scenes from the plaintiff's novel with similar passages and scenes from the version of the short story in the record. *See* Mayer declaration, ¶ 14 (and its Exhibit M). It simply suited the defendants' purpose to admit

9

these astonishing comparisons and substantial similarities between the short story and plaintiff's novel.[11]

The defendants have not denied having access to the plaintiff's work after it was published in March 2005. In fact, like *Americable* court, this Court is without evidence in the record to rule on whether the defendants had access to the plaintiff's work after its publication in March 2005, particularly since plaintiff has presented the Court with sufficient reasons for it to exercise Rule 56(f) discretion to allow discovery on the defendants designated "fatal flaw in Plaintiff's case" they described as "one of chronology." *Def. Br.*, p. 2. Every aspect of the plaintiff's argument to the defendants "chronology" contentions strongly suggests that publication of all of the defendants' works in the record occurred after March 2005; and also strongly suggests either creation and or changes/revisions in some way of each of the defendants' works after March 2005.

## CONCLUSION

Plaintiff has met the threshold needed to invoke this Court's discretionary power under Rule 56 sufficient "to assume that discovery *might* shed light on disputed factual issues." *Def. Br.*, p. 6 (emphasis in original). Therefore, for the foregoing reasons and those stated in her initial opposition to the defendants' motion for summary judgment, plaintiff respectfully requests the Court to enter an Order granting her Rule 56(f) request for discovery and either deny the defendants' summary judgment motion or defer ruling on the motion until after discovery is complete.

---

[11]      Plaintiff does not at this point in this litigation concede that "ordinary observer" test is the appropriate test to use in determining whether there are substantial similarities as has been suggested by the defendants. The defendants' works and the plaintiff's works are different types or genres of work, i.e., novel and short story, novel and screenplay, and novel and motion picture. Therefore, other approaches to analyzing similarities such as "quantitative/qualitative," for example, may be appropriate. *See Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132 (2nd Cir. 1998) (using the "quantitative/qualitative" approach to analyze different types of works).

Respectfully submitted,


Janice Scott-Blanton
Plaintiff, *pro se*


3578 Wharf Lane
Triangle, Virginia 22172
(703) 861-0028


## CERTIFICATE OF SERVICE

I hereby certify that I have hand-delivered and or mailed postage prepaid the foregoing to the following defendants and or their representative on this the 27th day of September 2007:

UNIVERSAL CITY STUDIOS PRODUCTIONS, LLLP
UNIVERSAL STUDIOS, INC.
UNIVERSAL STUDIOS LICENSING, LLLP
UNIVERSAL STUDIOS HOME ENTERTAINMENT, LLC
FOCUS FEATURES, LLC
RIVERROAD ENTERTAINMENT, LLC
DEL MAR PRODUCTIONS, LLC
LAVA FILMS, LLC
SIMON & SCHUSTER, INC.
ADVANCE PUBLICATIONS, INC.
ANNIE PROULX
LARRY McMURTRY
JAMES ALLEN SCHMAUS
DIANA OSSANA
c/o Steven J. Metalitz, Esquire           (HAND DELIVERED)
Mitchell Silberberg & Knupp, LLP
Counsel for Defendants
1818 N Street, N.W., 8th Floor
Washington, D.C. 20036


Janice Scott-Blanton

11

In The
## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA
Washington, D.C.

JANICE SCOTT-BLANTON, *pro se*,

      Plaintiff,

vs.                                    CIVIL ACTION NO. <u>1:07cv0098</u>

UNIVERSAL CITY STUDIOS PRODUCTIONS, LLLP, et al.,

      Defendants.

<u>[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION TO STRIKE</u>

This case comes before the Court on the Plaintiff's Motion to Strike from the record the Declarations of Marc E. Mayer and Nan Graham submitted by the Defendants in support of their summary judgment motion.

Having considered the Plaintiff's motion and the Defendant's opposition to that motion, the Court grants the Plaintiff's motion. Accordingly, it is

**ORDERED** that the Plaintiff's motion to strike is **GRANTED;** and the Clerk is **REQUESTED** to strike the Declarations of Marc E. Mayer and Nan Graham from the record in this case.

**SO ORDERED.**

                                      _____
                                        United States District Judge

*Exhibit A*

AP2 N6763 New Yorker 1997
Oct 13, 1997

Oct 13, 1997   58.3458

AO84 4

AP2 .N6763 New Yorker

Oct 1997   5834/52

SMR A

THE LIBRARY OF CONGRESS
READING ROOMS

READER WILL RETURN

PLEASE DO NOT REMOVE BOOKS FOR 90 MINUTES

Name  CARLOS HILLIARD

Date  JULY 19, 2006

Time  12:00 PM

174 (1983/10)

*Exhibit B*



**Motorola RAZR V3m**

**Style and Performance. V CAST Capable.**

MODEL CHARGES AND COVERAGE REQ'D FOR V CAST SERVICES.

NEXT PHONE

veri on

**Learn More**

SFGate

Quick Search    [GO]

**SFGATE HOME • BUSINESS • SPORTS • ENTERTAINMENT • TRAVEL**        **CLASSIFIEDS • JOBS • REAL ESTATE • CARS**

« JOLIE VISITS BOY... | MAIN | LATSIS' DAD REVEALS... »

# IT'S A GIRL FOR LEDGER AND WILLIAMS

Hollywood parents-to-be Heath Ledger and Michelle Williams are delighted after discovering their first baby will be a girl.

The "Dawson's Creek" actress, who met Ledger while filming the forthcoming cowboy romance "Brokeback Mountain," is expected to give birth in the next few weeks.

While promoting the Ang Lee-directed movie at this month's Toronto International Film Festival, the pregnant star revealed their impending bundle of joy was also conceived during filming.

She said, "It's strange to watch the film now because it means so much more to me.

"I met my husband there, the seed of my daughter was born there -- it's just really, really powerful."

Williams still insists she is in no hurry to walk down the aisle, despite already calling Heath her husband.

She adds, "I had a few fantasies about a husband and a wedding when I was a little girl. But I'm really happy with things just the way they are right now."

Listed Under: Heath Ledger | Comments (0) : Post Comment

## POST A COMMENT

**To protect our readers from malicious comments SFGate asks that you login or register to post a comment.**

**Sign On to post your comment.** Not Registered?

SFGate Screen Name:

---

**MAIN | ABOUT | CONTACT**



Some fun, funky Bay Area restaurants reveal some hidden gems for non-meat eaters. Food

More Entertainment News ↘

| **Celebrities** |
| --- |
| Britney Spears (296) |
| Paris Hilton (195) |
| Lindsay Lohan (172) |
| Angelina Jolie (156) |
| Madonna (138) |
| Brad Pitt (135) |
| Jessica Simpson (113) |
| TomKat (90) |
| Kevin Federline (88) |
| Jennifer Aniston (85) |
| More... |

| **Topics** |
| --- |
| American Idol (46) |
| Desperate Housewives (32) |
| Fashion (26) |
| Hip-Hop (68) |
| Marriage (10) |
| Movies (74) |
| Music (235) |
| Splitsville (15) |
| TV (183) |

| **Today's Dish** |
| --- |
| Timberlake Lashes Out At Paparazzi |
| Morgan Punished For Violating Probation |
| Rodriguez And McGowan Engaged? |
| Griffin And Wozniak Engaged? |
| Hilton Dating Swedish Tourist? |
| Timberlake And Furtado Are Diva Diners? |
| Britney Switches Lawyers |
| Crowe Bans Gambling From His Club |

Heath Ledger and Michelle Williams having girl

From Monsters and Critics.com

**PEOPLE NEWS**
**Heath Ledger and Michelle Williams having girl**
By WENN
Sep 25, 2005, 0:47 GMT

Hollywood parents-to-be Heath Ledger and Michelle Williams are delighted after discovering their first baby will be a girl.

The Dawson's Creek actress, who met Ledger while filming forthcoming cowboy romance Brokeback Mountain, is expected to give birth in the next few weeks.

While promoting the Ang Lee-directed movie at last month's ( August 05) Toronto Film Festival, the pregnant star revealed their impending bundle of joy was also conceived during filming.

She said, "It's strange to watch the film now because it means so much more to me.

"I met my husband there, the seed of my daughter was born there - it's just really, really powerful."

Williams still insists she is in no hurry to walk down the aisle, despite already calling Heath her husband.

She adds, "I had a few fantasies about a husband and a wedding when I was a little girl. But I'm really happy with things just the way they are right now."

This story is licensed from WENN © 2005 and published for the entertainment of our users only. Please address any inquiries regarding the content of this story to WENN.

© Copyright 2006,2007 by monstersandcritics.com.
This notice cannot be removed without permission.

*__Exhibit C__*

# Heath and Williams call it quits

By Herald wire services  |  Tuesday, September 4, 2007  |  http://www.bostonherald.com  |  Star Tracks

**HEATH LEDGER** and **Michelle Williams** called it quits after three years together, a close source of the couple confirmed to People magazine. "It was rocky for awhile," the snitch confessed. "They did what they could to make it work." The duo fell for each other while filming "Brokeback Mountain" in 2005 and shortly thereafter Williams gave birth to their first child together, a daughter, **Matilda**. Since then the Hollywood stars have made themselves a fixture in Brooklyn, N.Y. However, the **New York Daily News** reported the toothsome twosome's brownstone appeared unoccupied over the weekend.

**The article you requested has been archived**

All coverage within BostonHerald.com from the last 7 days remains **free of charge**. Articles do not always include original photos, charts or graphics.

» **Click for access to article within the archive**

**Article URL:** http://www.bostonherald.com/track/star_tracks/view.bg?articleid=1029216

**Related Articles:**

**Ledger gets cozy with Christensen**
/track/star_tracks/view.bg?articleid=1032828



Contact us  |  Print advertising  |  Online advertising  |  Herald history  |  News tips  |  Electronic edition  |  Browser upgrade  |  Home delivery  |  Herald wireless

© Copyright by the Boston Herald and Herald Media.
No portion of BostonHerald.com or its content may be reproduced without the owner's written permission.

## *Exhibit D*





Art Hazen Real Estate LLC
"Simply the best real estate company"
www.ahrealestate.com
click here for new listings

Check out the REAL ESTATE SCOREBOARD
each week in Planet Jackson Hole

**jackson's free news and entertainmen**

Home     About Us          Letters to the Editor          Classifieds          Rate Sheet          Download Paper          Blog



Jackson Hole's most comprehensive music, arts, entertainment and events calendar
**click here!**



**MANGY MOOSE** MUSIC

**Planet Blog**

**NEW RSS**

**Personals**

**Planet Store**

**Restaurant Guide**

**NEW Art Galleries**

**Webcam**

**Photo Gallery**

**Planet Covers**

**Community Links**

News Tips

PJH current edition and archives

# At close range with Annie Proulx
## Pulitzer prize-winning writer shares insights in film adaptation of 'Brokeback Mountain.'

*By Matthew Testa*

12.7.05

As brisk ticket sales to Saturday's screenings of "Brokeback Mountain" and related events sug is totally immune to being star struck. Although in this case, the buzz seems well justified, as Ang Lee ("Crouching Tiger, Hidden Dragon") is expected to be the Jackson Hole Film Institute "Brokeback"-related events start Friday evening with a forum on what it's like for men and wc orientations to grow up or live in Wyoming, and continue with screenings and Hollywood-type

"The phones have been ringing off the hook," said Todd Rankin of the JHFI, the local arts non screening for the valley, and the group that will reap the proceeds from the event. Film-fanati throughout Wyoming and from as far away as Boise. "We'll be sold out," he predicted.

The film "Brokeback Mountain" originated as a short story by Wyoming author E. Annie Proulx winning novel "The Shipping News" was also adapted to the screen. The story appears in Prou Wyoming tales, "Close Range," and is considered by many critics to be the book's standout pi filmmaker Matthew Testa asks the author about living and writing in Wyoming, her thoughts c the controversy surrounding the film.

**Planet Jackson Hole:** How did you come to write "Brokeback Mountain"? What inspired the

**Annie Proulx:** "Brokeback Mountain" was/is one of a number of stories examining rural West trained as an historian (French Annales school), and most of my writing is focused on rural Nc The story was not "inspired," but the result of years of subliminal observation and thought, ev of writing. As I remarked in a 1999 interview with The Missouri Review, Place and history are both in the broad, general sense and in detailed particulars. Rural North America, regional cul and seemingly attainable world the characters cherish in their long views despite the rigid anc their place and time interest me and are what I write about. I watch for the historical skew be hoped for and who they thought they were and what befell them.

**PJH:** Did it surprise you that, of all the pieces in your Wyoming collection, "Close Range," it w affair between cowboys that was adapted into a major Hollywood film?

**AP:** Diana Ossana, Larry McMurtry's writing partner, read the story in The New Yorker shortly years ago and urged Larry to read it. They both wanted to make a film from it even though th risky. They optioned the story from their own pockets, most unusual for screenwriters. I was would get to the big screen, and, in fact, it took years before it did.

**PJH:** I think it's clear to anyone who reads "Brokeback Mountain" that above all it's a wrenchi is about two cowboys, but it seems inaccurate to call it gay literature. How do you feel about agitprop emerging from liberal Hollywood? Did you ever intend for the story to be controversi

**AP:** Excuse me, but it is NOT a story about "two cowboys." It is a story about two inarticulate kids in 1963 who have left home and who find themselves in a personal sexual situation they nor can manage. The only work they find is herding sheep for a summer  some cowboys! Yet

**Planet Jackson Hole** is a weekly print and online newspaper covering news, entertainment, and arts in Jackson Hole, WY and the greater Yellowstone region.

The Planet is distributed free at over 600 locations throughout Jackson Hole, Wyoming and the surrounding area every Wednesday morning with an average weekly print run of around 10,000 copies.

The Planet challenges the status quo by providing provocative and insightful local and regional news reporting.

The Planet is politically independent and committed to providing an open forum for no-holds-barred opinion by national and local writers from a variety of perspectives about the issues that are important to Jackson Hole's residents and visitors.

cowboy myth, as are most people who live in the state, and Ennis tries to be one but never ge Jack settles on rodeo as an expression of the Western ideal. It more or less works for him unt salesman. Their relationship endures for 20 years, never resolved, never faced up to, always l confusion. How different readers take the story is a reflection of their own personal values, att feeling that a story is not finished until it is read, and that the reader finishes it through his or prejudices, world view and thoughts. Far from being "liberal," Hollywood was afraid of the scri agents. Of course I knew the story would be seen as controversial. I doubted it would even be when The New Yorker very quickly accepted it. In the years since the story was published in 1 letters from gay and straight men, not a few Wyoming-born. Some said, "You told my story," Wyoming," and a number, from fathers, said "Now I understand the hell my son went through breaking letters.

**PJH:** It's hard to think of "Brokeback Mountain" and not be reminded of the murder of gay co Shepherd in Laramie, even though your story is set in the '60s and the Shepherd killing happe Wyoming is the Equality State where independence, neighborliness and a live-and-let-live att also a bitter dislike of interlopers and change. Which is it? Is Wyoming generally a tolerant or experience?

**AP:** Matthew Shepherd was killed a year after "Brokeback Mountain" appeared in The New Yo the Equality State (a reference to women's suffrage rights granted in 1869, the world's earlies and hold office), but today it is also the state where women get some of the lowest salaries in the same work as men, where ranch women often do outside work, raise the kids, manage th more, but often have little say in running things, do not inherit the ranch if there is a brother legislators' act "to protect Married Women in their separate property, and the enjoyment of th Independence? How many Wyoming people depend on agricultural aid, social security, pensio business people fight monopoly instead of competition? How many residents actually garden, theirown clothes, hunt for the freezer, repair their own cars, build their own houses? Some fe they are in that older rural tradition and therefore quasi-independent; such people can be fou country people  people "with the bark on," as Remington called them. Neighborliness is also a many parts of the world, in the American West based on early settlers' need to help each othe people who work hard, know how to fix things, tackle big jobs, lend a helping hand, all comm respect ranchers, many of them under great duress, men and women who preserve landscape state. Although today only a miniscule percentage of the state's income comes from ranching, for many here, and that's a pretty good ideal to have and hold. Although there is generally a l the state, there are also bigots, mean people, haters, drug addicts, poachers, wife-beaters, ki in every other place in the world. Wyoming also has the highest suicide rate in the nation, esp men. The state is hardly perfect and we should not pretend it is some noble utopia. It is a con and its residents' psychologies, both tolerant and intolerant  as all of us are.



**PJH:** It would be difficult to find two screenwriters better suited to adapt your story to the scr Diana Ossana. Part of their job was to expand on major events in the lives of your characters describe with amazing economy in just a sentence or paragraph. Did the screenwriters consul process?



**AP:** Beyond some early questions, Diana Ossana and Larry McMurtry did not consult with me the screenplay. But I trusted them with the story, especially Larry McMurtry, whose ear and e equaled by none. I would likely have said no to any other screenwriter(s) who approached me



**PJH:** I imagine it's difficult to entrust your fiction to other artists for adaptation. Did you read before it went into production, or do you find it best to turn a story over entirely and walk awa



**AP:** Yes, of course it is difficult. I did read several versions of the screenplay. [McMurtry and C as soon as it was done and I noted a few infelicities. The question of whether or not it is bette the screenwriters' work is an individual choice. Since I don't write screenplays, and since films structure than stories or novels, I let the experts do their work. I had enough work on my pla no need to interfere.

**PJH:** Are you interested in writing screenplays, either original ones or adaptations of your own

**AP:** I doubt I could write screenplays  and I am not tempted.

**PJH:** Have you seen the film? How much does it resemble your original vision of the story  its themes and dramatic moments? Do you feel it accurately represents Wyoming?

**AP:** I have seen the film. It resembles the written story very closely, and the McMurtry-Ossan

do feel it accurately represents Wyoming some decades in the past. It is not clear to me, at l
character of the state is. Some think Wyoming is changing, becoming more aware and tolerar
in people, and there is evidence to support this view. Some think it will not ever change.

**PJH:** You've described yourself as passionate about getting details right, particularly details o
landscape and regional culture. Are you bothered at all that the film was shot in Canada rathe
like to see more film production brought to Wyoming?

**AP:** I had hoped the film would be shot in Wyoming, and, in fact, Ang Lee and I looked at pla
Horns. But the decision was not mine to make. The film was shot in Canada because, I was to
infrastructure (read big city Calgary with daily air service and hotels) that could support a film
designer, Judy Becker, toured Texas (where some of the story is set) and Wyoming, making r
landscape shots in Alberta would match what is on the ground in Texas and Wyoming. Except
are moving through a forest with deep ground moss, the landscapes very much fit Wyoming.
more film production brought to Wyoming. I think the state is missing a good opportunity to c
years ago New Mexico, then quite a poor state, decided that they would offer film companies
would make their films in New Mexico. The offer was attractive and since then many films hav
The average film brings millions of dollars into a state, from housing, meals and lodging, extr:
consulting and so forth. Since then many other states have set up loan situations to attract fil
is good that we are seeing more realistic and representative backgrounds in film. I think there
for Wyoming, and not only with film, but with all the arts.

**PJH:** It seems there could be no other name for this story than "Brokeback Mountain" it conj
beautiful place, but it's also an ominous name, suggestive of physical harm and disfigurement
you find the name?

**AP:** Brokeback is not a real place. There is, on a map I once saw, a Break Back Mountain in W
seen, but the name worked on several levels and replaced half a dozen more pedestrian name

**PJH:** You've now published two short story volumes set in Wyoming. Is there something abou
to the short form rather than the novel?

**AP:** I've also written a collection of short stories set in rural Vermont "Heart Songs," the old
music. Sometimes good story material just isn't enough for a long novel, or it fits my state of
instead of a longer work. Mostly I use the short story form for working with strong material or
and intellectually stimulating to work with the intensity, brevity, balance and word play of the

**PJH:** I've read you're a lover of coffee shops and yard sales  places where you can listen in or
on local dialects, aphorisms, story ideas. With your increasing notoriety, is it hard for you to s
so that you can move about unobtrusively as a writer?

**AP:** I don't love coffee shops, but I used to drive across the North American continent once a
and stopped at many cafes along the way where I did sometimes hear interesting things. One
conversations in line at the grocery store and post office. Yard sales have been good places to
especially valuable as so many small secondhand bookshops are disappearing. No, it is not dif
Wyoming anonymously. Women of a certain age are invisible. And most Wyoming people don
write novels or knit mittens.

**PJH:** I understand that some Wyoming folks have criticized you for being a relative newcome
"local" enough to write about the West. Does this kind of talk faze you at all? Is it always the
something of an outsider, an observer, anyway?

**AP:** The innocent belief that only people who have been born and brought up in a place can k
about it is more folklore than fact. It might seem logical, but it is not the way literature works
many outstanding regional American writers, but the outsider's eye is invaluable in writing an
literature has been written by outsiders, including much Western material: Walter Van Tilburg
Incident," "Track of the Cat") came from Maine, Owen Wister ("The Virginian") came from Per
Roosevelt ("The Winning of the West") from New York, Jack Schaeffer ("Shane") had never be
wrote his novel of the Johnson County war. There is room for both kinds of writers  local peop
certainly do not stop local people from writing whatever they wish. There's a little thing called
applies to writing.

**PJH:** What drew you to Wyoming as a place to live and write? Where does your interest in rur
from?

**AP:** All of my fiction, with the exception of "Heart Songs," has been written in Wyoming. Both Panhandle attracted me as interesting places both for landscape and American history. I was much of my story material is drawn from real historical events, sometimes reset in other peric and from her, I and my four sisters learned to use brush and pencil from the time we were ch landscape and place. Moreover, one of my ancestors, Joseph Maria La Barge, from Assomption Louis, was in Wyoming in 1825 with Ashley's fur trappers. He got himself scalped on the little town that today bears his name, and although Clymer says he perished, he returned to St. Lo happy life until he cracked his head on a curbstone. His sons were history, one of them, Josep the Yellowstone. My people on my mother's side have been in New England since 1635 (the o given them by Squanto and until very recently remained in the family since colonial times), ar Quebec since 1637. I feel that I, along with all other writers, am free to write about any place especial interest in North America. I have always lived in rural places and wouldn't have it any affection for Wyoming. I also have a deep affection for history and the fascinating multiplicity guises, especially in the creation of western and national myths. In travels across the country Wyoming as my place to write. The long sight lines and landscape that called me to walk and created images and even sentences and phrases. I would have moved here much earlier than responsibility to my mother in New England. Six weeks after she died I came to Wyoming.

**PJH:** Films have a way of romanticizing even the harshest rural settings, but you resist that s Even in "Brokeback Mountain," where the eponymous hilltop is a refuge and sanctuary for Jac ruggedness of the land and the bitter cold that drives the characters together. Do you think th the film? How do you experience the Wyoming landscape as inviting, forbidding, or both thins

**AP:** The characters Jack and Ennis are poor ranch kids  autochthonous  native, born to the so lives are hard in multiple ways. Neither they nor their stories have sentimental qualities. My v neither is Ang Lee's film. The Wyoming landscape, like human behavior, is extremely complex basinand- range topography, the mix of high plains, forested mountains, desert, highways an such varied landscape can mean psychologically, is expressed in both the story and the film.

**PJH:** What are you working on now?

**AP:** I, with a number of other people, am working a history of Wyoming's Red Desert region, and wildlife from Native American times to early white settlers, a look at the Cherokee Trail ar at horse-catching and oil exploration, at teepees and homesteads, big ranches and at least on examining reports of the last vestiges of native bison in the area, Thornburgh's march down t battle, desert elk and thumper trucks, present-day poachers, Finnish labor history and the UP from Lake Gosiute to coal mines are part of the picture. We are concerned with Irish, Chinese with mine explosions and gumbo roads, with sagebrush, insects, an old horse-catcher found s Haley, Wiff Wilson, "Doc" Chivington, outlaw hideouts, mystery fences, archeology and rock ir working on a new novel set mostly in the North American northern forests and New Zealand.

*Former Jackson resident Matthew Testa is a writer, director and television producer. He holds American Film Institute and is at work on several projects, including a feature film set in Wyoi New York.*

---

**-editor@planetjh.com**

**Brokeback Mountain Book**
Sample Fun Offers And Get The Brokeback
Mountain Book Free.
Ads by Goooooogle

**Jackson Hole Lodging**
Hotel and condo rentals in Jackson Hole,
Wyoming
Advertise on this site

More Jackson Hole
Information...

Home | About Us | Letters to the Editor | Classifieds | Rate Sheet | Download Paper | Contac

**www.planetjh.com** | Copyright © 2004-2005 Planet Jackson Hole, Inc.. All Rights Reserved. | **Site developed by Cry**

In The
**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**Washington, D.C.**

**JANICE SCOTT-BLANTON,** *pro se,*

**Plaintiff,**

**vs.**                                           **CIVIL ACTION NO. 1:07cv0098**

**UNIVERSAL CITY STUDIOS PRODUCTIONS, LLLP, et al.,**

**Defendants.**

<u>MOTION TO STRIKE AND INCORPORTATE MEMORANDUM</u>

Plaintiff Janice Scott-Blanton, as *pro se,* moves the Court for entry of an Order striking from the record the Declarations and supporting exhibits for Marc E. Mayer and Nan Graham submitted by the defendants in support of their summary judgment motion. Alternatively, plaintiff requests that certain paragraphs and related exhibits as identified below contained in each Declaration be stricken from the record. In support hereof, plaintiff states as follows.

The defendants collectively file a motion for summary judgment on or about March 23, 2007. In support of the motion, the defendants filed Declarations from Marc E. Mayer and Nan Graham in which each alleged that the facts they were asserting were based on ***their own personal knowledge.*** Both Declarations violate the requirements of Rule 56(e) for failure to be based on personal knowledge or would be inadmissible at trial on the grounds of speculative hearsay.

### i. Mayer Declaration

In paragraph 2 of the Declaration, Mayer alleged that Exhibit A attached thereto was "a true and correct copy of the short story by Annie Proulx . . ., as published in the October 13, 1997, issue of *The New Yorker* Magazine." Mayer further alleged that he obtained the copy from "representatives of *The New Yorker.*" Mayer made no representation or allegation that he was involved in anyway whatsoever in the process that led to the 1997 publication or in any other way in order to obtain such personal knowledge. Mayer simply makes such an allegation from his role as counsel for the defendants without offering any explanation of how he obtained his personal knowledge. Moreover, Mayer alleged that he obtained the copy from ***representatives*** of the magazine, and that, without more, constitutes hearsay as he attempts to assert that copy as original work of defendant Annie Proulx.

In paragraph 5 of the Declaration, Mayer alleged that Exhibit D attached thereto was "a true and correct copy of the short story entitled *Brokeback Mountain* as it appeared in Annie Proulx's book of short stories: 'Close Range: Wyoming Stories.'" Mayer further alleged that he purchased the "Close Range" book from an Internet retailer in 2007. It is absurd for Mayer to be asserting as "true and correct" the copy of the *Brokeback Mountain* story copied from the book "Close Range" he purchased in 2007 from the Internet retailer without attempting to explain how he obtained knowledge that that 2007 copy of "Close Range" was a "true and correct" copy of the original 1999 publication, or that the short story contained in "Close Range" was the "true and correct" original short story. Mayer is clearly making these naked and ridiculous assertions based on his involvement in this case as counsel for defendants, not that he was involved in the

2

process of publishing the original book and or short story and privy to obtaining personal knowledge about the story's origin.

In paragraph 7 of the Declaration, Mayer alleged that Exhibit F attached thereto was "a true and correct copy of the short story entitled *Brokeback Mountain* as it appeared in the book entitled *'Brokeback Mountain: Story to Screenplay.'"* For the same reasons stated above (and below for Graham's similar allegations) where Mayer asserted the short story was a "true and correct" copy, such an assertion violates Rule 56(e) requirement of personal knowledge and is pure speculation based on his role as counsel for defendants in this litigation.

In paragraph 14 of the Declaration, Mayer asserted yet again that Exhibit A thereto represented "the original 1997 short story." For the reason already stated above regarding Exhibit A, Mayer's assertion violates Rule 56(e) requirement of personal knowledge and is pure speculation based on his role as counsel for defendants in this litigation.

In paragraphs 7, 8 and 14 of the Declaration, Mayer has asserted that his "office" compared certain works for similarity. This assertion is speculative, hearsay and violates Rule 56(e) requirement for personal knowledge. Mayer did not allege that *he* compared the works, but rather his office as counsel for the defendants in this litigation. There is no declaration before the Court from Mayer's "office."

For the foregoing reasons, either the entire Mayer Declaration should be stricken from the record, or alternatively, paragraphs 2, 5, 7 and 14 and the related exhibits of the Mayer Declaration should be stricken from the record.

3

*ii. Graham Declaration*

In paragraph 2 of the Graham Declaration it was alleged that the paperback edition of "Close Range" was published in February 2000 and that a "true and correct copy of the paperback edition" was attached thereto as Exhibit 1. Graham's allegation regarding this book is a flagrant attempt to mislead this Court because the book plainly stated that it was published in 2003, not 2000. The International Standard Book Number ("ISBN") for this book is 0684852225. In information obtained for this ISBN from the Georgia Library at its website http://gapines.org/opac/en-US/skin/default/xml/rdetail.xml?r=2579484&t=close%20range&tp=keyword&d=0&hc=143&rt=keyword from the MARC record link at this web address plainly stated that this book was reprinted/reissued on March 28, 2006 as a *revision* of the 2003 and 1999 edition. Plaintiff has attached hereto as Exhibit 1 the information for this edition of the book, including the MARC record and explanation of the codes used in MARC records, from the Georgia library website. Line 005 indicates the last date the publisher of the book made a change to the record for that book, which with regards to this book, "Close Range," occurred on November 16, 2006. Line 008 contains the record of publications of the book, which with regards to this book, indicates that the last publication occurred on March 28, 2006 as a *revision* of the 2003 and 1999 edition.

More significantly, the Georgia library website also maintains the record for another edition of the book, "Close Range," that was published on June 25, 2000. Plaintiff has attached hereto as Exhibit 2 the information for this 2000 edition of the book from the Georgia library website. The MARC record for this particular edition indicates that it was a single publication on June 25, 2000 and that no subsequent

4

republications/reissues have occurred. Notably, both of the books have the same ISBN 0684852225, the former does not make reference at all to the latter, and this should not be the case. Two different published books *should not have the same ISBN* assigned to them.[1] The book, "Close Range," submitted by the defendants simply is not the original book "published in February 2000." *Graham Decl.,* ¶ 2. Plaintiff submits that the defendants are concealing the true original book, "Close Range," represented by the Exhibit 2 attached hereto because the book in the record was recently reprinted and republished in 2006 using the same ISBN assigned to the original published book from 2000 as a ruse and scheme to deceive by the defendants.[2]

In paragraphs 3 and 4 of Graham's Declaration, it was asserted that the stand alone version of *Brokeback Mountain* was the same version included in "Close Range" and in *Brokeback Mountain: Story to Screenplay.* The version of "Close Range" that was "published in February 2000" is not in the record and for the same reasons for striking paragraph 2 of Graham's Declaration, paragraphs 3 and 4 should be stricken as well.

The entire Graham Declaration should be stricken from the record, or alternatively, paragraphs 2, 3, and 4 and the related exhibits of the Graham Declaration should be stricken from the record.

---

[1]    According to the website for the United States ISBN Agency, "The purpose of the ISBN is to establish and identify *one title or edition of a title from one specific publisher and is unique to that edition,* allowing for more efficient marketing of products by booksellers, libraries, universities, wholesalers and distributors." http://www.isbn.org/standards/home/isbn/us/isbnqa.asp (Emphasis added).

[2]    Ironically, defendant Proulx, the author of all of the stories included in "Close Range," stated plainly in her essay "Getting Movied" included in *Brokeback Mountain: Story to Screenplay* that *"Close Range* contains *nine* stories." *Brokeback Mountain: Story to Screenplay,* p. 129 (emphasis added). The copy of "Close Range" being advanced in this litigation by the defendants contains *eleven* stories and this, yet another defendant created discrepancy, when considered with the discrepancies plaintiff has already pointed out above, strongly suggests there is another version of "Close Range" that the defendants are concealing.

5

Respectfully submitted,

Janice Scott-Blanton
Plaintiff, *pro se*

3578 Wharf Lane
Triangle, Virginia 22172
(703) 861-0028

## CERTIFICATE OF SERVICE

I hereby certify that I have hand-delivered and or mailed postage prepaid the foregoing to the following defendants and or their representative on this the 27th day of September 2007:

UNIVERSAL CITY STUDIOS PRODUCTIONS, LLLP
UNIVERSAL STUDIOS, INC.
UNIVERSAL STUDIOS LICENSING, LLLP
UNIVERSAL STUDIOS HOME ENTERTAINMENT, LLC
FOCUS FEATURES, LLC
RIVERROAD ENTERTAINMENT, LLC
DEL MAR PRODUCTIONS, LLC
LAVA FILMS, LLC
SIMON & SCHUSTER, INC.
ADVANCE PUBLICATIONS, INC.
ANNIE PROULX
LARRY McMURTRY
JAMES ALLEN SCHMAUS
DIANA OSSANA
c/o Steven J. Metalitz, Esquire                    **(HAND DELIVERED)**
Mitchell Silberberg & Knupp, LLP
Counsel for Defendants
1818 N Street, N.W., 8th Floor
Washington, D.C. 20036

Janice Scott-Blanton

6

*Exhibit 1*



**PINES**    close range: wyoming stories    [Go!]    Keyword    All Formats

Text Size: Regular / Large

**Choose a library to search**

PINES

| | | |
|---|---|---|
| Home | Result 1of 13    >> End | |
| Advanced Search | Record Summary | Place Hold |
| My Account | | |
| Log in | Title | Close range : Wyoming stories |
| My Title Results | Author | Proulx, Annie. |
| My Title Details | ISBN | 0684852225 |
| | Edition | First Scribner trade paperback ed. |
| | Publication Date | c2003 |
| Relevant Subjects | Publisher | Scribner |
| ▶ Frontier and pioneer life | Physical Description | print 285 p. : 21 cm. |
| ▶ Ranch life | Format | text |
| ▶ Wyoming | Abstract | A collection of stories set in Wyoming. They range from The Mud Below, on an itinerant rodeo cowboy, to People in Hell Just Want a Drink of Water, which is on a family feud. |
| | Online Resources | Contributor biographical information Publisher description |

| Copy Summary | Shelf Browser | Table of Contents | Excerpt | MARC Record |

[Print Page]

**LDR** 01470cam a2200313Ka 4500
001 ocm65221839
003 OCoLC
005 20061116144723.0
008 060328r20031999nyua 000 1 eng d
040    ‡aGZT ‡cGZT ‡dGZT
020    ‡a0684852225
035    ‡a(OCoLC)65221839
043    ‡an-us-wy
050 0 4 ‡aPS3566.R697 ‡bC58 2003
100 1  ‡aProulx, Annie.
245 1 0 ‡aClose range : ‡bWyoming stories / ‡cAnnie Proulx.
246 3 0. ‡aWyoming stories
250    ‡aFirst Scribner trade paperback ed.
260    ‡aNew York, NY : ‡bScribner, ‡cc2003.
300    ‡a285 p. : ‡c21 cm.
505 0 ‡aThe half-skinned steer -- The mud below -- Job history -- The blood bay -- People in hell just want a drink of water -- The bunchgrass edge of the world -- Pair of spurs -- A lonely coast -- The governors of Wyoming -- 55 miles to the gas pump -- Brokeback Mountain.
520    ‡aA collection of stories set in Wyoming. They range from The Mud Below, on an itinerant rodeo cowboy, to People in Hell Just Want a Drink of Water, which is on a family feud.
651  0 ‡aWyoming ‡xSocial life and customs ‡vFiction.
650  0 ‡aFrontier and pioneer life ‡vFiction.
650  0 ‡aRanch life ‡vFiction.
856 4 2 ‡3Contributor biographical information ‡uhttp://www.loc.gov/catdir/bios/simon051/98056066.html
856 4 2 ‡3Publisher description ‡uhttp://www.loc.gov/catdir/description/simon033/98056066.html

Basic Catalog (HTML only)   |   Find a Library Near Me   |   Help   |   About
PINES   |   GALILEO

Copyright © 2006 Georgia Public Library Service

# OCLC FirstSearch: Detailed Record
Your requested information from your library Library of Congress

Return

**WorldCat results for: kw: close and kw: range and kw: wyoming and kw: stories and dt= "bks" .
Record 5 of 26.**

| Detailed Record | Table of Contents | Add/View Comments | Excerpt |



## Close range :
## Wyoming stories /

Annie **Proulx**

2003, ©1999 **1st Scribner trade paperback ed.**
**English** ◆ Book : Fiction 285 p. ; 21 cm..
New York, NY : Scribner, ; ISBN: 0684852225 9780684852225

A collection of stories set in Wyoming. They range from The Mud Below, on an itinerant rodeo cowboy, to People in Hell Just Want a Drink of Water, which is on a family feud.

**GET THIS ITEM**

Access: http://www.loc.gov/catdir/bios/simon051/98056066.html

Availability: **Check the catalogs in your library.**
- Libraries worldwide that own item: 95
- Search the catalog at the Library of Congress

External Resources: •    Find It!
- Cite This Item

**FIND RELATED**

Find Items About: **Close range** (1); Proulx, Annie. (28)

Title: **Close range :
Wyoming stories /**

Author(s): Proulx, Annie.

Publication: New York, NY : Scribner,
**Edition:** 1st Scribner trade paperback ed.

Year: 2003, ©1999

Description: 285 p. ; 21 cm..

Language: English

Contents: The half-skinned steer -- The mud below -- Job history -- The blood bay -- People in hell just want a drink of water -- The bunchgrass edge of the world -- Pair of spurs -- A lonely coast -- The governors of Wyoming -- 55 miles to the gas pump -- Brokeback Mountain.

Standard No: ISBN: 0684852225; 9780684852225

Abstract: A collection of stories set in Wyoming. They range from The Mud Below, on an itinerant rodeo cowboy, to People in Hell Just Want a Drink of Water, which is on a family feud.

Access: **Materials specified:** Contributor biographical information

🔗 http://www.loc.gov/catdir/bios/simon051/98056066.html
**Materials specified:** Publisher description
🔗 http://www.loc.gov/catdir/description/simon033/98056066.html

**SUBJECT(S)**

| | |
|---|---|
| **Descriptor:** | Frontier and pioneer life -- Fiction. |
| | Ranch life -- Fiction. |
| **Geographic:** | Wyoming -- Social life and customs -- Fiction. |
| **Class Descriptors:** | **LC:** PS3566.R697 |
| **Responsibility:** | Annie Proulx. |
| **Material Type:** | Fiction (fic) |
| **Document Type:** | Book |
| **Entry:** | 20051019 |
| **Update:** | 20070607 |
| **Accession No:** | **OCLC:** 62114055 |
| **Database:** | WorldCat |

FirstSearch® Copyright © 1992-2007 OCLC as to electronic presentation and platform. All Rights Reserved.
**E-mail address:** FirstSearch@oclc.org    **Location:** http://FirstSearch.oclc.org



Return

# Part X:
# Field 008 for Books

**Field 008** is used for Fixed Length Data Elements ("Fixed Field Codes"). There are 40 character positions in field 008, numbered from 00-39. Undefined positions must contain either a blank (#) or a fill character ( | ). Positions 00-17 and 35-39 are defined the same way for all media.

The information shown here for positions 18-34 applies only to books. For explanation of all the positions below and for positions 18-34 for other media, see the *MARC 21 Format for Bibliographic Data.*

Note that field 008 has no indicators or subfield codes.

| | |
|---|---|
| 00-05 | Date entered on file (YYMMDD), where Y=year, M=month, and D=day |
| 06 | Type of date/publication status: |

| | | |
|---|---|---|
| b | = | no dates given; B.C. date involved |
| e | = | detailed date |
| s | = | single known date/probable date |
| m | = | multiple dates |
| r | = | reprint/reissue date (Date 1) and original date (Date 2) |
| n | = | dates unknown |
| q | = | questionable date |
| t | = | publication date and copyright date |
| | | = | no attempt to code |

| | |
|---|---|
| 07-10 | Date 1/beginning date of publication |
| 11-14 | Date 2/ending date of publication |

Date fields contain the year(s) of publication. The type of date(s) in these elements are specified in fixed field element 06: Type of date/publication status. (For further details, see the field 008 description in the *MARC 21 Format for Bibliographic Data.*)

# Part VIII:
# A List of Other Fields
# Often Seen in MARC Records

| | |
|---|---|
| 001 | Control number |
| 003 | Control number identifier |
| 005 | Date and time of latest transaction |
| 006 | Fixed-length data elements -- additional material characteristics |
| 007 | Physical description fixed field |
| 008 | Fixed length data elements (See Part X) |
| 022 | International Standard Serial Number (ISSN) |
| 037 | Source of acquisition |
| 041 | Language code |
| 043 | Geographic area code |
| 050 | Library of Congress call number |
| 060 | National Library of Medicine call number |
| 082 | Dewey Decimal classification number (the one recommended by the Library of Congress; locally-assigned call numbers may appear elsewhere) |
| 110 | Main entry -- Corporate name (less frequent under AACR2 rules) |
| 256 | Computer file characteristics |
| 263 | Projected publication date (indicates a CIP -- Cataloging in Publication -- record) |
| 306 | Playing time |
| 508 | Creation/production credits note |

510    Citation/references note (review sources)
511    Participant or performer note
521    Target audience note (first indicator: 0 = reading grade level, 1 = interest age level, 2 = interest grade level, 3 = special audience characteristics, 4 = motivation interest level)
530    Additional physical form available note
538    System details note
586    Awards note
656    Index term -- Occupation
730    Added entry -- Uniform title
852    Location
856    Electronic location and access
9XX    Reserved for local use. (They are used by vendors, systems, or individual libraries to exchange additional data)

**www.loc.gov/marc**

*Exhibit 2*

Evergreen Title Details                                                                Page 1 of 1

 **PINES**    close range: wyoming stories    [Go!]    Keyword    All Formats

Text Size: Regular / Large

**Choose a library to search**

**PINES**

Home
Advanced Search
My Account
Log in
My Title Results
My Title Details

🗄 Relevant Subjects
  ▶ 📁 Frontier and pioneer life
   ▶ 📁 Ranch life
    ▶ 📁 Wyoming

Result 10of 13    Start << >> End
Record Summary                                                                      Place Hold

| | | |
|---|---|---|
| | Title | Close range : Wyoming stories |
| | Author | Proulx, Annie. |
| | ISBN | 0684852225 |
| | Edition | |
| | Publication Date | c1999 |
| | Publisher | Scribner |
| | Physical Description | print 283 p. ; 21 cm. |
| | Format | 📖 text |
| | Abstract | |

| Copy Summary | Shelf Browser | Table of Contents | Excerpt | MARC Record |
|---|---|---|---|---|

[ Print Page ]

LDR 00660nam a2200229Ia 45 0
001 PIN01085805
003 DLC
005 19990504100747.0
008 000625s1999 nyu 000 1 eng
010 ‡a 98056066
020 ‡a0684852225 ‡cDLC
040 ‡aDLC ‡cDLC
050 0 0. ‡aPS3566.R697 ‡bC58 1999
082 0 0. ‡a813/.54 ‡221
100 1 ‡aProulx, Annie.
245 1 0. ‡aClose range : ‡bWyoming stories / ‡cAnnie Proulx.
260 ‡aNew York : ‡bScribner, ‡cc1999.
300 ‡a283 p. ; ‡c21 cm.
650 0. ‡aFrontier and pioneer life ‡zWyoming ‡vFiction.
650 0. ‡aRanch life ‡zWyoming ‡vFiction.
651 0. ‡aWyoming ‡xSocial life and customs ‡vFiction.
901 ‡ai0684852225 ‡bISxN

Basic Catalog (HTML only)  |  Find a Library Near Me  |  Help  |  About
PINES  |  GALILEO

Copyright © 2006 Georgia Public Library Service




## OCLC FirstSearch: Detailed Record
Your requested information from your library  Library of Congress

Return

WorldCat results for: (ti= "Close range") and (au= "Proulx, Annie"). Record **4** of **31**.

| Detailed Record | Table of Contents | Add/View Comments | Excerpt |



### Close range :
### Wyoming stories /

Annie **Proulx**

2000, 1999 **1st Scribner Paperback Fiction ed.**
**English** ◆ Book : Fiction 285 p. ; 21 cm.
New York, NY : Scribner Paperback Fiction, ; ISBN: 0684852225 (pbk.) :
9780684852225 (pbk.)

**GET THIS ITEM**

Availability: **Check the catalogs in your library.**
- Libraries worldwide that own item: 275
- Search the catalog at the Library of Congress

External Resources: ●  Find It!
- Cite This Item

**FIND RELATED**

Find Items About: **Close range** (1); Proulx, Annie. (28)

Title: **Close range :**
**Wyoming stories /**

Author(s): Proulx, Annie.

Publication: New York, NY : Scribner Paperback Fiction,
**Edition:** 1st Scribner Paperback Fiction ed.

Year: 2000, 1999

Description: 285 p. ; 21 cm.

Language: English

Contents: The half-skinned steer -- The mud below -- Job history -- The blood bay -- People in hell just want a drink of water -- The bunchgrass edge of the world -- Pair a spurs -- A lonely coast -- The governors of Wyoming -- 55 miles to the gas pump -- Brokeback Mountain.

Standard No: ISBN: 0684852225 (pbk.) :; 9780684852225 (pbk.); 0684852217 **LCCN:** 98-56066

**SUBJECT(S)**

Descriptor: Frontier and pioneer life -- Wyoming -- Fiction.
Ranch life -- Wyoming -- Fiction.

Geographic: Wyoming -- Social life and customs -- Fiction.

Class Descriptors: **LC:** PS3566.R697; **Dewey:** 813.54

Responsibility: Annie Proulx.

**Vendor Info:** Baker & Taylor Baker and Taylor YBP Library Services (BKTY BTCP YANK) 15.00
**Status:** active
**Material Type:** Fiction (fic)
**Document Type:** Book
**Entry:** 20000207
**Update:** 20070312
**Accession No:** OCLC: 43412941
**Database:** WorldCat

---

FirstSearch® Copyright © 1992-2007 OCLC as to electronic presentation and platform. All Rights Reserved.
**E-mail address:** FirstSearch@oclc.org   **Location:** http://FirstSearch.oclc.org


Return