UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| JANICE SCOTT-BLANTON, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 07-0098 (RMU) |
| | : | | |
| v. | : | Document Nos.: | 30, 32 |
| | : | | |
| UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

DENYING THE PLAINTIFF'S MOTION TO PERMIT DISCOVERY PURSUANT TO RULE 56(F)

**I. INTRODUCTION**

The plaintiff, Janice Scott-Blanton, proceeding *pro se*, alleges that her novel, *My Husband Is On The Down Low and I Know About It* ("*Down Low*"), is the creative source for the award-winning film *Brokeback Mountain*. She requests that the court permit discovery pursuant to Federal Rule of Civil Procedure 56(f), because it would be premature for the court to decide the defendants' outstanding motion for summary judgment without a period of discovery. While the plaintiff identifies specific facts she seeks to recover in discovery that would defeat the defendants' summary judgment motion, she fails to show a reasonable basis to suggest that discovery would create a triable issue of fact. As a result, the court denies the plaintiff's motion to permit discovery.

## II.  BACKGROUND

### A.  Factual History

Annie Proulx ("Proulx") wrote the short story *Brokeback Mountain* in 1997, which *The New Yorker* published and registered for copyright protection in October of that year.  Am. Compl. ¶ 38; Decl. of Marc E. Mayer ("Mayer") (D.D.C. Mar. 7, 2007) ("Mayer Decl."), Ex. A. Shortly thereafter, Proulx agreed to allow two screenwriters, Diana Ossana and Larry McMurtry, to adapt the story into a screenplay.  Mayer Decl., Ex. H.  In 1998, Ossana and McMurtry completed the 95-page screenplay.  *Id.*, Ex. J.  According to Nan Graham, the Vice President and Editor-in-Chief of Scribner,[1] Proulx re-published the short story in *Close Range: Wyoming Stories*, with minor edits to the introduction and the description of one of the main characters, in August 1999.  Declaration of Nan Graham (D.D.C. Mar. 23, 2007) ("Graham Decl.") ¶ 2. Ossana and McMurtry then assigned the rights to their screenplay to Columbia Pictures Industries, Inc. ("Columbia Pictures"), which obtained copyright certification for two screenplays, one in April 2000 and another in August 2004.  Mayer Decl., Exs. J, K.  The defendants contend that a verbatim version of the 1999 short story was re-published in *Close Range: Wyoming Stories* in 2003.  *Id.*, Ex. D.  The short story was again re-published as a stand alone book in 2005 and together with the screenplay in *Brokeback Mountain: Story to Screenplay* in 2006.  Graham Decl. ¶¶ 3, 4.

According to Jeffrey Roth, the Senior Vice President of Post Production for Columbia Pictures, the studio completed the final screenplay on May 20, 2004 and completed filming all material scenes by August 5, 2004.  Declaration of Jeffrey Roth (D.D.C. Mar. 7, 2007) ("Roth

---

[1]  Scribner published *Brokeback Mountain* the screenplay and the short story after its appearance in *The New Yorker*.

2

Decl.") ¶ 3. Roth also declared that the studio "locked"[2] the motion picture in January 14, 2005 and released it in theaters on December 9, 2005. *Id.* ¶¶ 5, 6.

In November 2004, the plaintiff wrote *Down Low*, a novel tracking a wife's discovery of her husband's homosexual affair and exploration of her own bisexuality. Am. Compl. ¶ 24. The plaintiff obtained copyright certification for her novel on January 20, 2005 and published it on March 15, 2005. *Id.* ¶¶ 25, 27, Ex. I. The plaintiff claims that she recognized "some similarity of expressions in the protected elements of the story and scene" between *Brokeback Mountain* and her novel after watching the film for the first time on June 11, 2006. *Id.* ¶ 32.

### B. Procedural History

Seven months after she noticed the similarities, the plaintiff filed her first complaint on January 16, 2007, seeking a preliminary and permanent injunction as well as damages for copyright infringement. Pl.'s Compl. ¶ 44. On March 14, 2007, the plaintiff filed a motion to amend her complaint, adding violations under the Lanham Act, 15 U.S.C. §§ 1125(a), 1117, the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 *et seq.*, and violations of statutory and common laws of the fifty states, U.S. territories and every foreign country where the defendants generated revenues. Am. Compl. ¶¶ 17, 18. On March 23, 2007, the defendants filed a motion for summary judgment. On April 3, 2007, the plaintiff filed a memorandum in opposition to the defendants' motion for summary judgment in which she requested that the court permit discovery under Rule 56(f) and, if the court denies this request, leave to file an opposition to the

---

[2] According to Roth, once a movie is "locked," the footage is in its final form and no further editing of the film takes place. Roth Decl. ¶ 5. After producers "locked" filming for *Brokeback Mountain*, Roth asserts that there were no changes to the storyline, dialogue, or characters, only adjustments to the musical score and the film's sound, including the addition of sound effects. *Id.* ¶¶ 5-6.

defendants' motion for summary judgment.[3]  Pl.'s Resp. in Opp'n to Mot. for Summ. J. ("Pl.'s Opp'n") at 1.

On July 19, 2007, the court denied the plaintiff's motion for a preliminary injunction because the plaintiff failed to demonstrate a substantial likelihood of success on the merits and failed to show that she would suffer irreparable harm.  Mem. Op. (July 19, 2007).  On August 27, 2007, the court issued a memorandum order granting the plaintiff's motion to amend her complaint as of right.  Mem. Op. (Aug. 27, 2007).  The court now turns to the plaintiff's motion for discovery pursuant to Rule 56(f).

### III.  ANALYSIS

#### A.  Legal Standard for Discovery Under Rule 56(f)

Under Rule 56(f), a court "may deny a motion for summary judgment or order a continuance to permit discovery if the party opposing the motion adequately explains why, at that timepoint, it cannot present by affidavit facts needed to defeat the motion." *Strang v. United States Arms Control & Disarmament Agency*, 864 F.2d 859, 861 (D.C. Cir. 1989); *Londrigan v. Fed. Bureau of Investigation*, 670 F.2d 1164, (D.C. Cir. 1981).  "[T]he purpose of Rule 56(f) is to prevent 'railroading' the non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery." *Dickens v. Whole Foods Market Group, Inc.*, 2003 WL 21486821, at *2 n.5 (D.D.C. Mar. 18, 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)).  Whether the circumstances warrant

---

[3]  On April 16, 2007, the plaintiff filed a motion for leave to file a sur-reply in support of her request for continuance under Rule 56(f).  Because the defendants raise no new arguments in their reply, the court denies the plaintiff's motion for leave to file a sur-reply. *See Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003); *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001) (denying leave to file a sur-reply because the plaintiff failed to demonstrate that the defendant's reply presented any new matters).

4

a continuance to permit discovery is a decision that falls within the discretion of the district court. *Stella v. Mineta*, 284 F.3d 135, 147 (D.C. Cir. 2002).

A non-moving party seeking the protection of Rule 56(f) "must state by affidavit the reasons why he is unable to present the necessary opposing material." *Cloverleaf Standardbred Owners Ass'n, Inc. v. Nat'l Bank of Wash.*, 699 F.2d 1274, 1278 n.6 (D.C. Cir. 1983); *see also Hotel & Rest. Employees Union, Local 25 v. Attorney Gen.*, 804 F.2d 1256, 1269 (D.C. Cir. 1986) (noting that this affidavit requirement helps "prevent fishing expeditions"), *vacated on other grounds*, 808 F.2d 847 (D.C. Cir. 1987). The non-moving party bears the burden of identifying the facts to be discovered that would create a triable issue and the reasons why the party cannot produce those facts in opposition to the motion. *Byrd v. Envtl. Prot. Agency*, 174 F.3d 239, 248 n.8 (D.C. Cir. 1999). The non-moving party must show a reasonable basis to suggest that discovery would reveal triable issues of fact. *Carpenter v. Fed. Nat'l Mortgage Ass'n*, 174 F.3d 231, 237 (D.C. Cir. 1999). "It is well settled that conclusory allegations unsupported by factual data will not create a triable issue of fact." *Byrd*, 174 F.3d at 248 n.8 (internal citations omitted); *see also Exxon Corp. v. Crosby-Miss. Res., Ltd.*, 40 F.3d 1474, 1488 (5th Cir. 1995) (holding that Rule 56(f) may not defeat summary judgment "where the result of a continuance to obtain further information would be wholly speculative").

### B. The Court Denies the Plaintiff's Motion for Discovery

#### 1. The Plaintiff Identifies Specific Facts for Discovery

The plaintiff identifies specific facts that, if true, could defeat the defendants' motion for summary judgment. The plaintiff seeks to establish that after the publication of her novel, the defendants (1) wrote a 180-page screenplay and based the motion picture on this screenplay; (2) wrote four "new" scenes specifically for the screenplay that are similar to the plaintiff's novel;

5

and (3) relied on both Proulx's short story and a novel, presumably the plaintiff's novel, during the production of the motion picture. Pl.'s Opp'n at 5 n.3, 6-10. Based on these facts, the plaintiff avers that the requested discovery is material to the legal dispute at the heart of the summary judgment motion because it suggests that the defendants had access to and copied her novel. *Id.* at 11-12, Ex. J.

The defendants counter that the plaintiff has failed to identify specific facts and fails to outline how the hypothetical discovery would affect the outcome of the pending motion. Defs.' Reply at 2, 7. The defendants insist that their "undisputed evidence precludes even the possibility of access or copying."[4] Defs.' Mot. for Summ. J. at 1. Indeed, the plaintiff acknowledges that she did not create her novel until November 2004 and did not publish it until March 2005, well after the defendants first copyrighted the short story and screenplay and while the motion picture was in post-production. Am. Compl. ¶¶ 24, 27, 29.

Yet, the plaintiff has met her burden of identifying the specific facts needed to defeat the pending motion for summary judgment. While the plaintiff's affidavit fails to identify specific facts needed to oppose the defendants' motion for summary judgment, the court can extract from the accompanying opposition motion sufficient facts to meet the affidavit requirement under Rule 56(f). *See Hotel & Rest. Employees Union, Local 25*, 804 F.2d at 1269 (stating that the court will not automatically deny a motion pending further discovery for failure to file a Rule 56(f) affidavit as long as outstanding discovery requests and opposition motions identify the information sought with specificity). Here, the plaintiff's identification of a 180-page screenplay

---

[4] Although the defendants have included a copy of the copyright certification for the 2004 screenplay, the court has not received a copy of the screenplay. Mayer Decl., Ex. K. Similarly, the plaintiff asserts that her novel included a self-contained screenplay, but the court has not received a copy of this screenplay. Am. Comp. ¶ 24.

and four "new" scenes satisfies Rule 56(f)'s specificity requirement and, if true, this evidence would reveal "discrepancies" in the defendants' timeline. Pl.'s Opp'n at 4, 5 n.3, 6-10.

### 2. No Reasonable Basis for Discovery Exists

Turning to the basis for requesting discovery, the plaintiff argues that the defendants wrote a 180-page screenplay and incorporated scenes from her novel because McMurtry stated in a November 2005 interview that a preliminary script "came out to be a little less than 60 pages, about a third of the complete script." Pl.'s Opp'n at 5 n.3, Ex. J. In addition, the plaintiff refers to a February 2006 interview, where Ossana characterizes four scenes as "new" and "added" to the screenplay. *Id.* at 7-10, Ex. I. The plaintiff also attempts to persuade the court that Proulx confirmed the alleged infringement of the plaintiff's novel when she acknowledged that the producers and screenwriters changed her short story while making the motion picture. *Id.* at 7, Ex. H. Finally, the plaintiff submits an interview with director Ang Lee, where he referred to a "novel" when discussing his inspiration for casting Jake Gyllenhaal as Jack Twist, as an indication of the defendants' deception. *Id.* at 4, Ex. D. In light of these interviews,[5] the plaintiff concludes that any version of the short story containing the "new" scenes must be fraudulent, including the copies of the short story that the defendants submitted to this court. *Id.* at 3.

---

[5] In an attempt to persuade the court that the defendants did not stop filming *Brokeback Mountain* in August 2004 as they allege, the plaintiff references a statement made by Michelle Williams, the actress who played the wife of Heath Ledger's character on screen and also became romantically involved with Ledger off-screen. Pl.'s Supp'l Opp'n at 8. Williams said that "[i]t's strange to watch the film now because it means so much more to me." *Id.*, Ex. B. She went on, "I met my husband there, the seed of my daughter was born there – it's just really, really powerful." *Id.* By subtracting 9 months from the day Williams gave birth, the plaintiff concludes that the child was conceived in "late-February/early-March 2005" and, therefore, the defendants must have been filming *Brokeback Mountain* at that time. *Id.* at 8. Even jumping through the series of inferential hoops the plaintiff's conclusion requires, this argument does not provide a reasonable basis for discovery because the plaintiff's novel was not published until March 15, 2005. Am. Comp. ¶ 27.

The plaintiff's reliance on these interviews, however, does not rise above mere speculation. In highlighting these interviews, the plaintiff asks the court to conclude that between March and December 2005, the defendants had access to her novel, copied and used parts of her novel to re-write the screenplay and film several new scenes for the motion picture, made additions to the short story based on her novel, and backdated the short story to conceal their mischievous feat. This series of events is so implausible as to lie outside the realm of reason. *Cf. Military Audit Project v. Casey*, 656 F.2d 724, 751 (D.C. Cir. 1981) (affirming the district court's denial of discovery because the affidavits in support of defendant's arguments were not "inherently implausible").

Not only are the events proposed by the plaintiff implausible, but they also run counter to evidence proffered by the defendants. For example, the plaintiff completely disregards Roth's affidavit, in which he asserts that the screenwriters completed the final screenplay for *Brokeback Mountain* by May 20, 2004 – ten months before the publication of the plaintiff's novel. Roth Decl. ¶ 2. Based solely on McMurtry's interview in which she references a preliminary script "about a third" the length of the complete script, the plaintiff surmises that the 113-page screenplay cannot be the final screenplay and that the defendants must have written a third screenplay, purposefully concealing it to avoid the detection of their infringement. Pl.'s Opp'n at 5-6. This vague reference, however, is insufficient without supporting facts. *See Carpenter*, 174 F.3d at 237 (affirming a district court's denial of a request for discovery because the plaintiff's assertion that contrasting employment reviews raised an inference of fabrication was "a plainly conclusionary assertion without supporting facts").

Moreover, the plaintiff's allegation that the defendants included four "new" scenes in this "final" screenplay is contradicted by overwhelming evidence. The defendants produce an

8

affidavit stating that "virtually every one of the motion picture story and character elements that the plaintiff claims they copied from her novel in fact came directly from (or was a direct outgrowth of) the original 1997 short story." Mayer Decl. ¶ 14. Exhibit M of the affidavit substantiates this assertion by pinpointing the page number and the text in the 1997 short story for each one the four scenes that the plaintiff claims were written specifically for the screenplay.[6] *Id.*, Exs. A, M. Yet another affidavit confirms that "no changes were made to the story between 1999 and 2005." Graham Decl. ¶ 3.

Finally, the plaintiff's contention that the reference Lee makes to a "novel" should be attributed to the plaintiff's work, *Down Low*, is unpersuasive. Based on context, Lee is plainly referring to the short story,[7] but, even if he was not referring to the short story, the casting of

---

[6] According to the 1997 short story printed in *The New Yorker*, the four scenes that the plaintiff claims to be new are all included in the original short story. Mayer Decl., Ex. A. In the first scene Ennis staggers into a gangway to throw up. Pl.'s Opp'n at 9. This starts on page 76 of the magazine: "Within a mile Ennis felt like someone was pulling his guts out hand over hand a yard at a time. He stopped at the side of the road and . . . tried to puke but nothing came out." Mayer Decl., Ex. A. The next scene, describing the reunion scene between Ennis and Jack four years after their first sexual encounter, is on page 77: "The fourth summer since Brokeback Mountain came on and in June Ennis had a general-delivery letter from Jack Twist . . . . They seized each other by the shoulders, hugged mightily . . . ." *Id.* The third scene where Ennis confronts Jack about his trip to Mexico is depicted on page 83: "Hell yes I been [to Mexico]. . . . Measure the fuckin short leash you keep me on, then ask me about Mexico . . . ." *Id.* Finally, on page 84, Proulx describes Ennis' visit to Jack's parents where "Ennis sat at the kitchen table with Jack's father." *Id.*

To the extent the plaintiff's arguments hinge on the submission of fraudulent copies of *The New Yorker* and other publications of the short story, the plaintiff, as the defendants note, can confirm the authenticity of the documents through independent sources such as the Copyright Office, libraries and private book dealers. Defs.' Supp'l Br. at 9. The plaintiff acknowledges that the copy of *The New Yorker* submitted by the defendants is identical to the copy on file with the Library of Congress and presents no evidence that the remaining publications are fraudulent. Pl.'s Supp'l Opp'n at 5 n.4.

[7] Lee states that he "cast Heath very much as the short story required[, but] did something quite different with Jake. In the novel, he is even stronger, bulkier, shorter, very rough. And Jake, of course is more like a city boy." Pl.'s Opp'n at 4, Ex. D. Lee is referring to the short story when describing Jake just as he refers to it when describing Heath's character. This is made obvious by the fact that the short story describes Jakes character as "raised on a small, poor ranch[]," a "high-

Gyllanhaal took place before the publication of *Down Low*, making it impossible for Lee to have considered it when casting Gyllanhaal for the film. *Compare* Roth Decl. ¶ 3 (stating that "no 're-shooting' or additional photography [for the full-length motion picture] took place after August 2004") *with* Am. Compl. ¶ 27 (acknowledging that *Down Low* was published on March 15, 2005). Without an adequate basis to pursue discovery and without reason to question the veracity of the affidavits submitted by the defendants, the plaintiff's desire to "test and elaborate" the affiants' testimony is otiose. *Strang*, 864 F.2d at 861 (affirming a district court's decision to deny discovery because the plaintiff "offered no specific reasons demonstrating the necessity and utility of discovery to enable her to fend off summary judgment"). In sum, while the plaintiff identifies specific facts needed to defeat the defendants' motion for summary judgment, she has not offered a reasonable basis to demonstrate the utility of discovery to justify her motion.

### IV.  CONCLUSION

For the foregoing reasons, the court denies the plaintiff's motion to permit discovery under Rule 56(f). An order instructing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 15th day of November 2007.

RICARDO M. URBINA
United States District Judge

---

school drop-out boy[] with no prospects, brought up to hard work and privation, [] rough-mannered, rough-spoken, inured to the stoic life." *Id.*, Ex. A at 74.