## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JANICE SCOTT-BLANTON,      :
                           :

          Plaintiff,       :      Civil Action No.:    07-0098 (RMU)
                           :

          v.             :      Document No.:    22
                           :

UNIVERSAL CITY STUDIOS    :
PRODUCTIONS LLLP *et al.*,    :
                           :

          Defendants.    :

## MEMORANDUM OPINION

### GRANTING THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This case comes before the court on the defendants' motion for summary judgment. The *pro se* plaintiff, Janice Scott-Blanton, alleges that her novel, "My Husband Is On The Down Low and I Know About It" ("Down Low"), is the creative source for the award-winning motion picture "Brokeback Mountain." In her complaint, the plaintiff alleges violations of the Copyright Act, 17 U.S.C. §§ 101 *et seq.*; violations under the Lanham Act, 15 U.S.C. §§ 1125(a), 1117; and violations of statutory and common laws of the fifty states, U.S. territories and every foreign country where the defendants generated revenues. Because no reasonable juror could conclude that the defendants had access to the plaintiff's novel before the completion of the short story and because the alleged similarities between "Down Low" and the defendants' works that are not in the short story are not protected under copyright law, the court grants the defendants' motion for summary judgment on the plaintiff's Copyright Act claim. In addition, the court grants the defendants' motion for summary judgment as to the plaintiff's remaining claims because they arise from the same alleged conduct.

## II.  BACKGROUND

### A.  Factual History

The pertinent factual background is detailed in the court's November 15, 2007

Memorandum Opinion.  Mem. Op. (Nov. 15, 2007) at 2-3.  In short, after *The New Yorker*

magazine published Annie Proulx's short story "Brokeback Mountain" on October 13, 1997,

Diana Ossana and Larry McMurtry adapted it into a screenplay in 1998.  Decl. of Marc E. Mayer

(Mar. 7, 2007) ("Mayer Decl."), Ex. H.  Subsequently, Ossana and McMurtry assigned the rights

to their screenplay to Columbia Pictures Industries, Inc. ("Columbia Pictures"), which obtained

copyright certification for two screenplays, one in April 2000 and another in August 2004.

Mayer Decl., Exs. J, K.  According to Jeffrey Roth, the Senior Vice President of Post Production

for Columbia Pictures, the studio completed filming all material scenes for the motion picture by

August 5, 2004.  Decl. of Jeffrey Roth (Mar. 7, 2007) ("Roth Decl.") ¶¶ 2-3.  Roth also stated

that the footage was in its final form in January 2005; the studio cut the final print in March

2005; and the studio released the motion picture in theaters on December 9, 2005.  *Id*. ¶¶ 5-6.

In November 2004, the plaintiff authored "Down Low."  Am. Compl. ¶ 24.  The plaintiff

obtained a certificate of registration for her novel on January 20, 2005, and she published it on

March 15, 2005.  *Id*. ¶¶ 25, 27 & Ex. I.  The plaintiff claims that she recognized "some similarity

of expressions in the protected elements of the story and scene" between "Brokeback Mountain"

and her novel after watching the film for the first time on June 11, 2006.  *Id*. ¶ 32.

### B.  Procedural History

Seven months after she noticed the similarities, the plaintiff filed her first complaint

seeking a preliminary and permanent injunction as well as damages for copyright infringement.

On March 14, 2007, the plaintiff filed a motion to amend her complaint.  Nine days later, the

defendants filed a motion for summary judgment.  Defs.' Mot. for Summ. J. ("Defs.' Mot.").  On

April 3, 2007, the plaintiff filed a memorandum in opposition to the defendants' motion for

summary judgment in which she requested that the court permit discovery under Rule 56(f) and,

if the court denied this request, leave to file an opposition to the defendants' motion for summary

judgment.  *See generally* Pl.'s Mot. for Discovery.

On July 19, 2007, the court denied the plaintiff's motion for a preliminary injunction

because the plaintiff failed to demonstrate a substantial likelihood of success on the merits and

failed to show that she would face irreparable injury.  Mem. Op. (July 19, 2007).  On August 27,

2007, the court issued a Memorandum Order granting the plaintiff's motion to amend her

complaint as of right, Mem. Op. (Aug. 27, 2007), and on November 15, 2007, the court denied

the plaintiff's motion to pursue discovery pursuant to Rule 56(f) because the plaintiff failed to set

forth a reasonable basis for the discovery, Mem. Op. (Nov. 15, 2007).  The court allowed the

plaintiff another opportunity to fully respond to the defendants' motion, however.  Before

turning to the defendants' motion for summary judgment, the court provides a brief synopsis of

the parties' works.

### C.  The Plaintiff's Novel: "Down Low"

The plaintiff's novel is set in the southern United States during the 1980's and depicts the

love story of a married couple, Annette and James.  *See generally* JANICE SCOTT-BLANTON, MY

HUSBAND IS ON THE DOWN LOW AND I KNOW ABOUT IT (JaRon Publishing Group, Inc. 2005).

The novel recounts Annette's exploration of her bisexuality and James' struggle to deal with his

bisexuality.  *Id.*  As a young adult, Annette realizes that she is bisexual but is afraid to explore

physical intimacy with women.  *Id.* at 7-8.  To Annette's surprise, James is very accepting of her

bisexuality and encourages her to initiate relationships with other women.  *Id.* at 11-20.

Unbeknownst to Annette though, James has had sexual desires for men and had a sexual encounter with a childhood friend when he was 15 years old. *Id.* at 62. They begin interacting with other couples: James has sexual encounters with women and Annette with both men and women. *Id.* at 77-81. Eventually, Annette tells her family about her sexual orientation, and they are very supportive. *Id.* at 123.

After several years of marriage, James comes to terms with his own bisexuality and begins having an affair with Thomas, a family friend. *Id.* at 197-204. James, however, is afraid to discuss his newfound bisexual identity with Annette and is also afraid that his sexual orientation will end his career as an officer in the military. *Id.* at 141-150. Annette grows suspicious that James is having an affair and begins reading James's journal. *Id.* In doing so, she confirms that he is having an affair with Thomas and that he has been tormented by his feelings toward men. *Id.* She then witnesses a sexual encounter between James and another man. *Id.* at 207-15. When she confronts James, he admits to being bisexual and having an affair. *Id.* at 223. Devastated by the news, the two separate for several years, but they eventually reunite and rekindle their relationship. *Id.* at 245-249. By the end of the novel there is a renewed sense of hope built on a foundation of tolerance.

### D. The Defendants' Works: "Brokeback Mountain" – the Short Story, the Screenplay and the Motion Picture

Based on Proulx's short story, the motion picture for "Brokeback Mountain" centers on Ennis and Jack, "two young men who unexpectedly forge a complicated lifelong relationship and a decades-long love affair that they try to hide from the rest of the world." *Bertlent v. Focus Features, LLC*, 2006 WL 1594478, at *1 (S.D.N.Y. June 8, 2006); *see also* Annie Proulx, *Brokeback Mountain*, THE NEW YORKER, Oct. 13, 1997, at 74; BROKEBACK MOUNTAIN (Focus Features 2005); ANNIE PROULX, LARRY MCMURTRY & DIANA OSSANA, BROKEBACK

MOUNTAIN: STORY TO SCREENPLAY (Scribner 2006).  This epic love story begins in rural Wyoming in the summer of 1963, when Ennis, a stoic introvert, and Jack, an optimistic extrovert, fall in love while herding sheep together on Brokeback Mountain.  ANNIE PROULX, LARRY MCMURTRY & DIANA OSSANA,  BROKEBACK MOUNTAIN: STORY TO SCREENPLAY (Scribner 2006) at 6-28.  At the end of the summer, however, the men separate, get married and start a family.  *Id.* at 28-30, 40-41, 43, 47.

After four years apart, Jack visits Ennis.  *Id.* at 44-47.  When they first see each other, they are so overwhelmed that they kiss each other in front of Ennis' home.  *Id.* at 46-47.  Alma, Ennis' wife, witnesses their kiss but remains silent.  *Id.*  Once reunited, Ennis and Jack see each other a couple of times a year, telling their respective wives that they are going on fishing trips.  *Id.* at 50, 56-58.  During one of these trips, Jack suggests that they move to his father's ranch and live together.  *Id.* at 52-54.  Ennis declines because he fears that the reaction to two men living together will lead him to lose his family or his life.  *Id.*  As the years progress and as their marriages deteriorate, Ennis and Jack continue to see each other.  *Id.* at 71-72.  Alma eventually divorces Ennis, and a few years later, she confronts him about his affair with Jack.  *Id.* at 61, 68-69.  Upset, Ennis storms out of the house without saying goodbye to his children.  *Id.*

After the divorce, Ennis is unable to see Jack as often as he had in the past due to his obligation to pay child support.  *Id.* at 80-83.  As Ennis and Jack begin to drift apart, Ennis becomes even more withdrawn and melancholy.  *Id.* at 72.  Jack expresses his frustration with the surreptitious and infrequent nature of their encounters and admits that he has been with other men.  *Id.*  at 81-83.  One day as Ennis is going through his mail, he sees a postcard he addressed to Jack with "DECEASED" stamped in red.  *Id.* at 86.  Ennis calls Jack's wife and learns that he was killed ostensibly when a flat tire that he was inflating exploded, slamming the rim of the tire

into his face. *Id.* at 86-89. Ennis then visits Jack's family home, and there, in the back of Jack's

closet, is a postcard of Brokeback Mountain. *Id.* at 89-92. Next to the postcard on a wire

hanger, he finds his shirt from that first summer on Brokeback Mountain carefully tucked inside

one of Jack's own shirts from that summer. *Id.* The final scenes poignantly depict Ennis'

continued love for Jack and deep remorse over his passing. *Id.* at 89-97.


## III. ANALYSIS

### A. Legal Standard for Motions for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are

"material," a court must look to the substantive law on which each claim rests. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could

establish an element of a claim or defense and, therefore, affect the outcome of the action.

*Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable

inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true.

*Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere

existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion

for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make

a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to

the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

The nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if he "support[s] his allegations . . . with facts in the record," *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999) (quoting *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993)), or provides "direct testimonial evidence," *Arrington v. United States*, 473 F.3d 329, 338 (D.C. Cir. 2006). Indeed, for the court to accept anything less "would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene*, 164 F.3d at 675.

### B. The Court Grants the Defendants' Motion for Summary Judgment on the Plaintiff's Claim Pursuant to the Copyright Act

It is undisputed that *The New Yorker* magazine published Proulx's short story "Brokeback Mountain" on October 13, 1997. Defs.' Mot. at 2; Pl.'s Opp'n[1] at 2. It is also undisputed that the plaintiff created "Down Low" in November 2004, registered it with the Copyright Office on January 20, 2005 and self-published it on March 15, 2005. Am. Compl. ¶¶ 24-27; Defs.' Mot. at 1. Despite "Down Low's" relatively late arrival on the publication scene, the plaintiff alleges that after she published the novel, the defendants incorporated protectible elements of "Down Low" into the "Brokeback Mountain" screenplay and motion picture and then revised and backdated the short story. Am. Compl. ¶ 38; Pl.'s Mot. for Discovery at 6-10.

---

[1] On April 3, 2007, the plaintiff styled her memorandum as an opposition to the defendants' motion for summary judgment, but instead of opposing the defendants' arguments, the plaintiff "invoke[d] Ruled 56(f)" and "request[ed] that the court give her additional time . . . to respond to the defendants [sic] motion for summary judgment." Pl.'s Mot. for Discovery at 11, 12 n.8. Because the court denied the plaintiff's motion for discovery and because the plaintiff is proceeding *pro se*, the court allowed additional time for the plaintiff to respond to the defendants' motion for summary judgment. Mem. Op. (Nov. 15, 2007). The plaintiff then filed an opposition responding to the defendants' arguments on November 30, 2007, and the court refers to this filing as "Pl.'s Opp'n."

Because the plaintiff fails to substantiate her allegation that the defendants backdated the short story and because the remaining similarities are either not protectible under copyright law or not similar to the screenplay and motion picture, the court grants the defendants' motion for summary judgment. *See Atkins v. Fisher*, 331 F.3d 988, 995 (D.C. Cir. 2003) (noting that "summary judgment would be appropriate only 'if the works are so dissimilar as to protectible elements that no reasonable jury could find for the plaintiff on the question of substantial similarity'" (quoting *Sturdza v United Arab Emirates*, 281 F.3d 1287, 1297 (D.C. Cir. 2002))).

### 1. Legal Standard for Copyright Infringement

The Constitution authorizes Congress to "secur[e] for limited Times to Authors . . . the exclusive Right to their respective Writings . . . ." U.S. CONST. art. I, § 8, cl. 8. Congress in turn enacted the Copyright Act, which protects "works of authorship" that are original, independent, possess at least a modicum of creativity and are "fixed in a tangible medium of expression." 17 U.S.C § 102(a); 1 NIMMER ON COPYRIGHT § 2.01 [A]-[B] (2007). While originality is the *sine qua non* of copyright law, "[o]riginality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). To maintain a copyright infringement claim, the plaintiff must establish (1) "ownership of a valid copyright" and (2) "that the defendants copied original or 'protectible' elements of the copyrighted work." *Sturdza*, 281 F.3d at 1295 (citing *Feist Publ'ns, Inc.*, 499 U.S. at 361). As to the first prong, a certificate of registration issued by the Copyright Office within five years after the first publication of the work constitutes prima facie evidence of a valid copyright and of the facts stated therein. 17 U.S.C. § 410(c); *see also Whitehead v. Paramount Pictures*, 53 F. Supp. 2d 38, 46 (D.D.C. 1999).

To establish copying under the second prong, the plaintiff may prove, in the absence of direct evidence, that "the defendants had access to the copyrighted work and [that there is] substantial similarity between the protectible material in plaintiff's and defendants' works." *Prunte v. Universal Music Group*, 484 F. Supp. 2d 32, 40-41 (D.D.C. 2007); *Whitehead,* 53 F. Supp. 2d at 46.  In determining whether the works are substantially similar, the court must first identify which parts of the artist's work, if any, are protectible and second, whether an ordinary observer could conclude that "the defendant[s] unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value."  *Sturdza*, 281 F.3d at 1296 (quoting *Country Kids 'N City Slicks v. Sheen*, 77 F.3d 1280, 1288 (10th Cir. 1996)).

### 2.  Proulx did not Have Access to the Plaintiff's Novel Before Completing the Short Story

In their motion for summary judgment, the defendants maintain that they did not have access to the plaintiff's novel because all of the "Brokeback Mountain" works at issue, especially the short story, were created before the plaintiff published her novel.  *See generally* Defs.' Mot. The record contains three certificates of registration with the Copyright Office for Proulx's short story.  Mayer Decl., Ex. E; Pl.'s Opp'n, Exs. A, G.  First, *The New Yorker* magazine obtained a certificate of registration on October 14, 1997 for the issue in which the short story was first published.  Pl.'s Opp'n, Ex. A.  Second, Proulx obtained a certificate of registration in August 1999 when she published a revised version[2] of the short story, along with several other stories, in *Close Range: Wyoming Stories*.  Mayer Decl., Ex. E.  Finally, Proulx's company, Dead Line Ltd., obtained a separate certificate of registration exclusively for the short story in April 2004.

---

[2]    The 1997 and 1999 short stories are virtually identical, only an introductory paragraph was added to the 1999 version.  *Compare* ANNIE PROULX , *Brokeback Mountain* in CLOSE RANGE: WYOMING STORIES 255 (Scribner 2003) *with* Annie Proulx, *Brokeback Mountain*, THE NEW YORKER, Oct. 13, 1997, at 74.

Pl.'s Opp'n, Ex. G.  Because the Copyright Office issued the first two of these certificates of registration within five years after the first publication of the short story, these two certificates of registration constitute prima facie evidence of the validity of the copyright.  17 U.S.C. § 410(c).

Although the plaintiff concedes that the court should "presume the validity of any information contained in a copyright registration certification," Pl.'s Opp'n at 15 n.7, she steadfastly holds to her theory that the defendants infringed on the protectible elements of her novel by revising Proulx's short story and then backdating this new version, *id.* at 2-13.  To support her theory, the plaintiff draws out apparent contradictions between copies of the short story in the record and other statements made by individual defendants in a series of interviews. *See generally* Pl.'s Opp'n.  Specifically, she alleges inconsistencies regarding a split-motel scene, a second tent scene, four "new" scenes, and the song *Water Walking Jesus*.  Pl.'s Opp'n at 9-13.  As evinced in the discussion below, the plaintiff's arguments are unpersuasive.

### a. The Short Story Does not Contain a Split-Motel Scene

In the short story, after a four-year hiatus, Ennis and Jack, while together in a motel, discuss their feelings for each other and their future plans together.  Annie Proulx, *Brokeback Mountain*, THE NEW YORKER, Oct. 13, 1997, at 78-79.  In the motion picture, however, Ennis and Jack discuss their relationship both while in the motel and around a campfire on Brokeback Mountain.  BROKEBACK MOUNTAIN: STORY TO SCREENPLAY at 48-54.[3]  The plaintiff references interviews in which Proulx and McMurtry discuss a disagreement they had with director Ang Lee over his decision to split the dialogue in the motel scene between the motel and Brokeback

---

[3]     Because the screenplay in BROKEBACK MOUNTAIN: STORY TO SCREENPLAY closely tracks the dialogue and scenes in the motion picture, the court cites to the screenplay rather than the motion picture for ease of reference in analyzing the plaintiff's claims.  *Compare* LARRY MCMURTRY, DIANA OSSANA, ANNIE PROULX,  BROKEBACK MOUNTAIN: STORY TO SCREENPLAY (Scribner 2006) *with* BROKEBACK MOUNTAIN (Focus Features 2006).

Mountain.  Pl.'s Opp'n at 2-3, 10-11.  The plaintiff then contends that "all versions of the short

story in the record reflect these two separate scenes," and therefore, these short stories must be

fraudulent.  Pl.'s Opp'n at 3.

      Standing on a faulty premise, the plaintiff's allegation falls flat.  The plaintiff incorrectly

asserts that "all versions of the short story in the record reflect these two separate scenes."  Pl.'s

Opp'n at 3.  A careful review of the copies of the short story in the record reveals that all have

Jack and Ennis discussing their relationship in a motel room and not, as the plaintiff alleges, split

between two separate scenes.  *See* Annie Proulx, *Brokeback Mountain*, THE NEW YORKER, Oct.

13, 1997, at 78-79; *see also* ANNIE PROULX , *Brokeback Mountain* in CLOSE RANGE: WYOMING

STORIES 255, 267-71 (Scribner 2003); ANNIE PROULX, BROKEBACK MOUNTAIN 23-31 (Scribner

2005); ANNIE PROULX, LARRY MCMURTRY & DIANA OSSANA,  BROKEBACK MOUNTAIN: STORY

TO SCREENPLAY 11-15 (Scribner 2006).  Accordingly, Proulx's disagreement with Lee over this

scene is valid given the differences between the short story and the motion picture.  Pl.'s Opp'n,

Ex. B at 136.  Moreover, as the defendants note, McMurtry explicitly stated that his

disagreement with Lee stemmed from changes between drafts of the screenplay, not between the

short story and the screenplay.  Defs.' Reply at 7 n.6; Pl.'s Mot. for Discovery, Ex. I at 3 (stating

that "in the *original script* we had the dialogue in the reunion motel scene and the dialogue soon

after up on the mountain occurring all in one scene: in the motel[, but] Ang wanted to divide that

dialogue into two scenes" (emphasis added)).  Thus, the plaintiff has failed to produce even a

scintilla of evidence in support of her claim that there is a discrepancy between the individual

defendants' statements in interviews and either the copies of the short story in the record or the

affidavits submitted by the defendants.  *Anderson*, 477 U.S. at 252 (holding that a nonmoving

party must establish more than "the mere existence of a scintilla of evidence" in support of its

position).

### b.  The Short Story Does not Contain a Second Tent Scene

Similarly, based on Lee's statement that he added a second tent scene to the motion

picture, the plaintiff claims that all copies of the short story in the record are fraudulent because

they all contain this second tent scene.  Pl.'s Opp'n at 3-4, 12.  The plaintiff once again is

incorrect.  While a tent scene in both the short story and the motion picture serves as the

backdrop for Ennis and Jack's first sexual encounter, the short story does not contain a second

tent scene.  *See, e.g.*, Annie Proulx, *Brokeback Mountain*, THE NEW YORKER, Oct. 13, 1997, at

76.  It simply mentions, "[t]hey never talked about the sex, let it happen, at first only in the tent

at night, then in the full daylight . . . ."  *Id.*  In contrast, the motion picture contains a second love

scene in the tent.  BROKEBACK MOUNTAIN: STORY TO SCREENPLAY at 18-21.  According to Lee,

he included the second love scene to "confirm that they commit to the love, so it's reasonable for

the next twenty years they are going back."  Pl.'s Opp'n, Ex. K at 2.  This is another example of

the evidence flatly contradicting the plaintiff's assertions.  Accordingly, no reasonable juror

could conclude that the copies of the short story presented to the court are fraudulent.

### c.  The Four "New" Scenes are in the Short Story

In addition, the plaintiff re-visits the interview in which Ossana and McMurtry respond to

a question regarding their favorite "new" scenes written for the screenplay.  Pl.'s Opp'n at 4, 11.

In the interview, Ossana explains:

> I found (and still find) several scenes particularly affecting – the scene where
> Ennis staggers into the gangway after he and Jack's first parting; their reunion
> scene after four years apart; the confrontation scene about Mexico; and the scene
> when Ennis goes to Jack's home and interacts with Jack's parents.  All the added
> scenes were a challenge . . . .

Pl.'s Mot. for Discovery, Ex. I at 2.  In its November 15, 2007 Memorandum Opinion, the court determined that "the plaintiff's allegation that the defendants included four 'new' scenes in this 'final' screenplay is contradicted by overwhelming evidence."  Mem. Op. (Nov. 15, 2007) at 8-9. The court determined that each of the four scenes is firmly rooted in the 1997 short story and referenced the relevant page number and quotation of the short story where the scenes can be found.  *Id.* at 9 n.6.  Furthermore, the court noted that the defendants have submitted affidavits in support of the fact that "virtually every one of the motion picture story and character elements that the plaintiff claims they copied from her novel in fact came directly from (or was a direct outgrowth of) the original 1997 short story."  *Id.* at 9 (quoting Decl. of Marc E. Mayer (Mar. 7, 2007) ¶ 14).  Finally, the court noted that the plaintiff can confirm the authenticity of the copies of the short story on record with independent sources such as the Copyright Office, private book dealers and public libraries including the Library of Congress.  *Id.* at 9 n.6.  The plaintiff's inability to present evidence of an alternative version of the short story from any one of these independent sources further undermines the legitimacy of her claims.  Therefore, the court concludes that no reasonable fact finder could conclude that the copies of the short story on record are fraudulent based on Ossana and McMurtry's response to the interview question in light of the overwhelming evidence to the contrary.  *Columbia Pictures Indus., Inc. v. Landa*, 974 F. Supp. 1, 7 (D.D.C. 1997) (recognizing that "[a]lthough summary judgment is ordinarily disfavored in copyright infringement cases, when the evidence is so overwhelming that a court would be justified in ordering a directed verdict at trial, it is proper to grant summary judgment" (quoting *Steinberg v. Columbia Pictures Indus., Inc.*, 663 F. Supp. 706, 709 (S.D.N.Y. 1987)) (internal quotations and citations omitted)).

### d. The Song *Water Walking Jesus* Does not Miraculously Save the Plaintiff's Claim

Lastly, in support of the alleged backdating, the plaintiff points to evidence that the song *Water Walking Jesus* was written in 2004, but mentioned in the purported 1997 short story. Pl.'s Opp'n at 4, 11-12. The defendants explain that Proulx conceived of the song for the 1997 short story, but that "a fully realized musical composition using that title was created for the motion picture in 2004." Defs.' Reply at 7. The plaintiff presents no reason to doubt the defendants' posited chronology, and more importantly fails to provide a credible reason to believe her claim that the defendants incorporated elements of her novel into the short story and backdated these versions before submitting them to this court. *Moore v. Columbia Pictures Indus., Inc.*, 972 F.2d 939, 942 (8th Cir. 1992) (holding that a "bare possibility of access is not enough; rather [the plaintiff] must prove that the defendants had a reasonable possibility of proving his work"). Accordingly, the overwhelming evidence renders the plaintiff's spurious claims defunct as a matter of law because no reasonable juror could find that the copies of the short story are fraudulent. Because Proulx did not have access to the plaintiff's novel before she completed her short story, the plaintiff is foreclosed from asserting a copyright infringement claim for any elements in "Down Low" that allegedly resemble elements in the short story. *See Mag Jewelry Co. v. Cherokee Inc.*, 496 F.3d 108, 115, 119 (1st Cir. 2007) (affirming a district court's decision to grant summary judgment on copyright claims where the plaintiff failed to "elicit probative evidence of access").

### 3. The Plaintiff's Novel is not Substantially Similar to the Defendant's Screenplay and the Motion Picture

The plaintiff contends that "Brokeback Mountain," the final screenplay and the motion picture, unlawfully infringed protectible elements of her novel. *See generally* Pl.'s Mot. for Discovery; Pl.'s Opp'n. Assuming, *arguendo*, that the defendants had access to the plaintiff's

novel prior to the completion of the motion picture,[4] the plaintiff still must identify protectible

elements in her work that are so substantially similar to the defendants' work "that an ordinary

reasonable person would conclude that the defendant[s] unlawfully appropriated the plaintiff's

protectible expression by taking material of substance and value."  *Sturdza*, 281 F.3d at 1295-96

(quoting *Country Kids 'N City Slicks*, 77 F.3d at 1288).

### a. Several Elements Identified by the Plaintiff are not Protectible

Before the court can determine whether "Down Low" and the "Brokeback Mountain"

screenplay and motion picture are substantially similar, the court must "filter[] out the

unprotectible elements such as ideas or *scènes à faire*."  *Stromback*, 384 F.3d at 297 (stating that

"[t]he essence of the first step is to filter out the unoriginal, unprotectible elements – elements

that were not independently created by the inventor, and that possess no minimal degree of

creativity").  In the instant case, the plaintiff produces a list of over 50 elements that she

contends establish substantial similarity between "Down Low" and the defendants' works.

Compl. ¶ 40; Pl.'s Mot. for Discovery, Ex. J; Pl.'s Opp'n, Ex. E.  Because the plaintiff created

"Down Low" after Proulx published "Brokeback Mountain" the short story, the court only

reviews the elements in "Down Low" that are allegedly similar to elements only found in the

screenplay and the motion picture.

Of the elements only relating to the screenplay and the motion picture, several are

commonplace incidents and settings, which are not protected under copyright law.  These are: (1)

James and Annette visiting the movie theatre; (2) James and Annette calling their unborn child

"Junior"; (3) James drinking beer to excess; (4) James coming home from work and walking up

---

[4]     The plaintiff disputes the defendants' assertion that "no 're-shooting' or additional photography
took place after August 2004, with the exception of obtaining a scenic establishing shot with no
dialogue and no actors in or about January 2005."  Decl. of Jeffrey Roth (Mar. 7, 2007) ¶ 3.

behind Annette and giving her a kiss as she is making dinner in the kitchen; (5) James

experiencing emotional turmoil, anger, guilt and resentment; (6) Annette and James' daughter,

Kynosha, hearing her parents argue; (7) Kynosha planning to attend college; (8) Kynosha giving

James a hug when he returns home; (9) Annette giving birth and her parents being there, but not

James; (10) Annette feeding Kynosha in the kitchen; (11) Annette hugging Kynosha and crying;

(12) Annette expressing her emotions to James at a restaurant; (13) Annette gaining weight

during a stressful time; (14) Annette working overtime and seeing less of Kynosha; (15) Annette

trying to find and then reading James' journal; (16) Annette becoming upset after learning that

her husband was having an affair; (17) having a friend named Jenny; (18) placing items on the

kitchen table so others will take notice; (19) going to a prominent swing club; (20) spending the

Fourth of July in Las Vegas; and (21) attending a church social on New Year's Eve.

Although the elements are part of a protectible novel, they are not protectible in isolation

because they do not possess the requisite modicum of creativity. *See Stenograph L.L.C. v.*

*Bossard Assoc., Inc.*, 144 F.3d 96, 100 (D.C. Cir. 1998) (concluding that "unoriginal portions of

a software program can be copied without resulting in copyright infringement"). Indeed, the

public domain would have a scant selection if stock settings such as the movie theatre, the

kitchen, Las Vegas, a church picnic or a club were subject to copyright protection. *Gaiman v.*

*McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004) (defining the *scènes à faire* doctrine as prohibiting

a copyright owner from proving infringement "by pointing to features of his work that are found

in the defendant's work as well but that are so rudimentary, commonplace, standard, or

unavoidable that they do not serve to distinguish one work within a class of works from

another"). Similarly, incidents such as the birth of a child, a hug between a father and daughter,

covertly reading a spouse's journal, family outings to celebrate the Fourth of July and New

Year's Eve, a child going away to college, a fight between parents, an absent and drunk father

and a woman struggling with weight gain are general plot ideas that copyright law does not

protect. *Berkic v. Crichton*, 761 F.3d 1289, 1293 (9th Cir. 1985) (explaining that "[g]eneral plot

ideas are not protected by copyright law; they remain forever the common property of artistic

mankind"); *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) (holding that a

quarrel between families of different ethnicities and religions, the marriage of their children, the

birth of grandchildren and a reconciliation were not protected by copyright). Therefore, the court

concludes that these elements are *scènes à faire* and are not protectible. *See Sturdza*, 281 F.3d at

1295 (stating that copyright protection does not extend to what are known as *scènes à faire*, *i.e.*,

"incidents, characters or settings which are as a practical matter indispensable, or at least

standard, in the treatment of a given topic").

### b. The Remaining Elements Identified by the Plaintiff, Even if Protectible, are Remarkably Different from the Corresponding Elements in "Brokeback Mountain"

The remaining elements in "Down Low" that the plaintiff alleges were infringed, even if

protectible, are not so substantially similar to elements in the screenplay and the motion picture

to survive summary judgment. *Sturdza*, 281 F.3d at 1296 (quoting *Country Kids 'N City Slicks*,

77 F.3d at 1288). For example, the plaintiff contends that the defendants copied a scene in

"Down Low" in which James, at 15 years of age, walks down a dark alley with his friend,

Darryl, and has sex. Down Low at 62. The "Brokeback Mountain" scene, however, portrays

Jack, as a grown man, going to Mexico; there he "turns down an alley" in which male prostitutes

are standing and walks off with one of them. Brokeback Mountain: Story to Screenplay at

64-65. Contrary to the plaintiff's characterization, these two scenes are more different than

similar. Jack is a grown man, compared to James – a 15-year-old kid. Furthermore, Jack turned

down an alley to find a prostitute – whom he did not know – to have sex with, whereas James'

*friend*, Darryl, led him to "the back of [a] store," and "before [he] knew it," he and Darryl were engaged in sexual relations.  *Compare* BROKEBACK MOUNTAIN: STORY TO SCREENPLAY at 64-65 *with* DOWN LOW at 62.  Moreover, it is clear that the idea of having sex in an alley with a member of the same sex cannot be copyrighted; it is the form that the author's creative expression takes that is protected.  *See Baker v. Selden*, 101 U.S. 99, 103-04 (1880) (holding that it is an axiom of copyright law that protection extends only to the particular expression of an idea and never to the idea itself).

In addition, this scene from "Brokeback Mountain" does not infringe, as the plaintiff alleges, a scene in "Down Low," in which "James searches the internet for someone to have sex with."  Compl. ¶ 40.  Even assuming that searching the Internet for someone to have sex with is protectible, there simply is no overlap of creative expression.  Indeed, none of the creative expression in going to Mexico to have sex with a male prostitute bears any resemblance to the form of expression in "Down Low," which involves an Internet search.  Consequently, the court determines that no reasonable juror could conclude that the Mexico scene in "Brokeback Mountain" infringed the plaintiff's work.

The plaintiff next asserts that the scene in which James and Annette tell their daughter, Kynosha, about James' sexuality is substantially similar to a scene in which Ennis' daughter, Alma Jr., responds to a question from Ennis' girlfriend, Cassie, about whether Ennis is "ever gonna see fit to settle down again."  Compl. ¶ 40.  Alma Jr. answers, "[m]aybe Daddy's not the marrying kind."  *Id.*  Again, these scenes are remarkably different.  Unlike Annette and James in "Down Low," who tell their daughter Kynosha about James' bisexuality, Ennis and Alma never tell Alma Jr. about Ennis' sexual preferences.  *Compare* BROKEBACK MOUNTAIN: STORY TO SCREENPLAY at 77 *with* DOWN LOW at 246.  And, Alma Jr.'s response to Cassie's question

appears to be a reflection of the anger she feels toward Cassie for diverting her father's affections, not a tacit acknowledgement of Ennis' sexual preferences.  *See* BROKEBACK MOUNTAIN: STORY TO SCREENPLAY at 77 (stating that Alma Jr. "[r]ises as ENNIS'S truck pulls up, excited[; s]ees CASSIE in the passenger seat[; h]er face falls a bit").  Cassie's follow-up question, "You don't think [he's the marrying kind]? Or you don't think I'm the one for him?" further supports this interpretation because Cassie recognizes Alma Jr.'s displeasure with her, not with Ennis.  Finally, even if Alma Jr. did acknowledge her father's proclivity for sleeping with men, her sinking disposition stands in stark contrast to Kynosha's unqualified acceptance.  *Compare* BROKEBACK MOUNTAIN: STORY TO SCREENPLAY at 77 (indicating that Alma Jr. was embarrassed at how rude she was) *with* DOWN LOW at 246 (explaining how very accepting Kynosha was about James).  Thus, no reasonable juror could conclude that this scene infringed the plaintiff's work.

### c. The Total Concept and Feel of the Two Works are Markedly Different

Additionally, the two works as a whole are dissimilar.  *Stomback*, 384 F.3d 297-99.  The court considers the works as a whole because "protectible expression may arise through the ways in which artists combine even unprotectible elements."  *Sturdza*, 281 F.3d at 1297-99; *accord Peter Pan Fabrics*, 274 F.2d at 489.  Indeed, the substantial similarity determination requires comparison not only of the two works' individual elements in isolation, but also of their "overall look and feel."  *Sturdza*, 281 F.3d at 1297; *accord Williams v. Crichton*, 82 F.3d 581, 588 (2d Cir. 1996) (stating that "[p]rotection covers the 'pattern' of the work . . . the sequence of events and the development of the interplay of characters").  An ordinary observer charged with viewing the works in question here may find a few oblique similarities in the plot, characters and sequence of events, but any similarities are merely coincidence and are insufficient to survive

summary judgment.  *See Arden v. Columbia Pictures Indus., Inc.*, 908 F. Supp. 1248, 1249 (S.D.N.Y. 1995) (stating that even when a novel and film are based on the same idea, a man trapped in a day that repeats itself over and over, the two works express that idea in very different ways).

Viewed in its entirety, "Down Low" presents the plaintiff's original expression about an African-American couple coming to terms with its sexuality during the 1980's and 1990's. "Down Low" is a sexually-explicit account of two people conflicted by their sexual orientation, whose secrets have the potential to destroy their marriage and James' career in the military. Annette and James enjoy a swinger lifestyle, through which Annette explores her bisexuality, but James struggles to cope with his own bisexuality.  Although the marriage nearly collapses due to James' secret homosexual affair, the novel generally is optimistic: James and Annette resolve their differences; Kynosha accepts her father's bisexuality and plans to attend college; and Annette begins counseling married, bisexual couples.

In contrast, "Brokeback Mountain" is a morose depiction of two ranch hands, Ennis and Jack, attempting to balance their lives as married, family men with their love for one another. Even the setting, the rugged openness and harsh terrain of the West, adds to a feeling of emptiness and trepidation that hangs over their relationship.  The dialogue is reserved, and the sexual encounters are limited, furthering the sense of emptiness and longing.  The music, too, is slow and melancholic.  The ending only serves as confirmation of the hopelessness of their situation – they will never be together.  Simply put, the optimistic portrayal of a heterosexual relationship in "Down Low" stands in stark contrast to the dark pall cast over the homosexual relationship in "Brokeback Mountain."

The characters themselves are also quite different.  Annette and James are communicative, frequently verbalizing their feelings about family, friends, sexual partners and each other.  The discourse between Jack and Ennis is purposefully understated, however.  As discussed above, this verbal minimalism adds to the air of disquiet, allowing the audience to infer the longing and turmoil felt by Jack and Ennis.  While neither set of characters lacks depth or passion, each is decidedly different.

Finally, the plaintiff argues that the sequence of events in the two works is substantially similar.  Compl. ¶ 40.  In "Down Low," Annette and James meet, give birth to a daughter, marry, begin their swinger lifestyle and then struggle with James' affair and sexual identity.  But in *Brokeback Mountain*, Ennis and Jack meet, fall in love and then separate.  Only after parting ways do they marry women and start a family.  Given the considerable differences between the two works outlined above, any similarity in the number of years of marriage before divorcing (12), the number of years before having dinner again with that former spouse (2) and the number of years before reuniting with a homosexual partner (4) is only coincidental.  *Murray Hill Publ'ns, Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 320 (6th Cir. 2004) (noting that "random similarities scattered throughout the works can be discounted" (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)) (internal quotations omitted)).  Because the plaintiff's claim cannot survive on mere coincidence, the court grants the defendants' motion for summary judgment on the plaintiff's claim under the Copyright Act.

### C.  The Court Dismisses the Plaintiff's Claims under the Lanham Act and the Statutory and Common Law of the Fifty States and Foreign States

In addition to her claim under the Copyright Act, the plaintiff brings claims under the Lanham Act and

> claims for unjust enrichment, unfair competition, and antitrust violations under either the statutory and or common laws of each of the fifty (50) States in the United States, Washington, D.C., each United States territory, and each foreign country in which the defendants generated revenues of any type from their infringement of plaintiff's copyrighted novel.

Am. Compl. ¶¶ 17-18.  The court agrees with the defendants' assertion that the plaintiff's claims "are premised on the very same conduct that gives rise to (and thus purely derivative of) her claims under copyright law."  Defs.' Reply at 8.  For instance, the plaintiff states in her amended complaint that the claims under the statutory and common law of the fifty states and foreign states arise "from [the defendants'] infringement of plaintiff's copyrighted novel."  Am. Compl. ¶ 18; *see Whitehead*, 53 F. Supp. 2d at 53-54.  Likewise, in light of the plaintiff's inability to establish that the defendants' copied her work, the plaintiff's claim under the Lanham Act must fail.  Without any proof of copying or misappropriation, the plaintiff could not establish customer confusion as to the source of the work.  *See Globalaw Ltd. v. Carmon & Carmon Law Office*, 452 F. Supp. 2d 1, 61 (D.D.C. 2006) (explaining that it is "well settled that in order for a Lanham Act plaintiff to receive an award of damages the plaintiff must prove either actual customer confusion or deception resulting from the violation, . . . or that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of customer confusion" (quoting *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 483 (2d Cir. 1998))).  Accordingly, the court grants the defendant's motion for summary judgment as to the plaintiff's remaining claims.  *See Whitehead v. Time Warner, Inc.*, 2000 WL 33542703, at *3 (D.D.C. June 14, 2000) (dismissing derivative Copyright Act claims).

## IV.  CONCLUSION

For the foregoing reasons, the court grants the defendants' motion for summary judgment.  An order instructing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 20th day of March 2008.


RICARDO M. URBINA
United States District Judge